# United States Court of Appeals for the Fifth Circuit

## No. 22-10387

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ARIZONA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ARKANSAS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INDIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, LOUISIANA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, MOUNTAINEER PARK HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, NEBRASKA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, OREGON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, PENNSYLVANIA HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, WASHINGTON HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION,

*Plaintiffs – Appellants,*

and

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs – Appellants,*

*versus*

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH SCHANZER; HORSERACING INTEGRITY AND SAFETY AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION; COMMISSIONER KELLY SLAUGHTER; COMMISSIONER ROHIT CHOPRA; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE WILSON,

*Defendants – Appellees.*

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

On Appeal from the United States District Court
for the Northern District of Texas
Case No. 5:21-cv-00071-H
Honorable James Wesley Hendrix

Daniel Robert Suhr
Reilly Stephens
Jeffrey D. Jennings
Liberty Justice Center
440 North Wells Street, Suite 200
Chicago, Illinois 60654
Telephone (312) 637-2280
dsuhr@libertyjusticecenter.org
rstephens@libertyjusticecenter.org
jjennings@libertyjusticecenter.org

Fernando M. Bustos
Bustos Law Firm, P.C.
1001 Main Street, Suite 501
Lubbock, Texas 79408
Telephone (806) 780-3976
fbustos@bustoslawfirm.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

1.    Pursuant to Fifth Circuit Rule 28.2.1, Appellants file this Certificate of Interested Persons. The case number, style, and complete case caption of all parties is on the preceding cover pages.

2.    The undersigned counsel of record certifies that the following listed persons and non-governmental entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

a.  National Horsemen's Benevolent and Protective Association
b.  Arizona Horsemen's Benevolent and Protective Association
c.  Arkansas Horsemen's Benevolent and Protective Association
d.  Indiana Horsemen's Benevolent and Protective Association
e.  Illinois Horsemen's Benevolent and Protective Association
f.  Louisiana Horsemen's Benevolent and Protective Association
g.  Mountaineer Park Horsemen's Benevolent and Protective Association
h.  Nebraska Horsemen's Benevolent and Protective Association
i.  Oklahoma Horsemen's Benevolent and Protective Association
j.  Oregon Horsemen's Benevolent and Protective Association
k.  Pennsylvania Horsemen's Benevolent and Protective Association
l.  Tampa Bay Horsemen's Benevolent and Protective Association
m. Washington Horsemen's Benevolent and Protective Association (collectively, the "Horsemen" or "Plaintiffs-Appellants")
n.  Jerry Black
o.  Katrina Adams
p.  Leonard Coleman, M.D.
q.  Nancy Cox
r.  Joseph Dunford
s.  Frank Keating
t.  Kenneth Schanzer

u. The Horseracing Integrity and Safety Authority, Inc.

v. Any, owner, breeder, trainer, jockey, racehorse veterinarian, person licensed by a State racing commission, or worker in the horseracing industry, including but not limited to members of the Jockey Club, as well as any owner, operator, or employee of a horse racetrack.

3.    Defendants-Appellees Jerry Black; Katrina Adams; Leonard Coleman, Jr.; Nancy Cox; Joseph Dunford; Frank Keating; Kenneth Schanzer; and the Horseracing Integrity and Safety Authority, Inc. (collectively, the "Authority")[1] are represented by Pratik A. Shah, Lide E. Paterno, Aileen M. McGrath, and Brennan H. Meier with Akin Gump Strauss Hauer & Feld LLP as well as John C. Roach and David T. Royse with Ransdell Roach & Royse, PLLC.

Defendants-Appellees the Federal Trade Commission; Lina M. Khan, in her official capacity as Chair of the Federal Trade Commission; Noah Joshua Phillips, in his official capacity as Commissioner of the Federal Trade Commission; Rebecca Kelly Slaughter, in her official capacity as Commissioner of the Federal Trade Commission; and

---

[1] The list of Defendants-Appellees in this Certificate of Interested Persons matches those in Plaintiffs-Appellants' Notice of Appeal, ROA.1534, plus the additional Defendants-Appellees from the nominating committee who are in the Texas Notice of Appeal. Plaintiffs-Appellants also updated the FTC Commissioners in their Notice of Appeal, per Fed. R. Civ. P. 25(d) and Fed. R. Civ. P. 43(c)(2). In response to a suggestion from the clerk, Plaintiffs-Appellants plan to file a letter requesting the official case caption be changed to reflect the Defendants-Appellees' correct names listed above.

Christine S. Wilson, in her official capacity as Commissioner of the Federal Trade Commission (collectively, the "FTC" or "Commission") are represented by Joseph F. Busa and Mark Bernard Stern with the United States Department of Justice.

Intervenors-Plaintiffs-Appellants the State of Texas and the Texas Racing Commission (collectively, "Texas") are represented by Lanora Christine Pettit and Cody T. Rutowski with the Office of the Attorney General of Texas as well as Virginia S. Fields with the Texas Racing Commission.

<u>s/ Daniel Robert Suhr</u>
Attorney of record for Plaintiffs-Appellants

**REQUEST FOR ORAL ARGUMENT**

The Horsemen respectfully request oral argument and a decision in this case by January 1, 2023, the date to which the Horseracing Integrity and Safety Authority has delayed implementation of the anti-doping and medication control program of the Horseracing Integrity and Safety Act ("HISA" or the "Act").[2]

The Horsemen request oral argument because of the importance of the legal theory at issue, the nondelegation doctrine. This constitutional question has received great interest from both this Court and the Supreme Court in recent years, but it still suffers from a dearth of case law relative to its long history. Oral argument would help place this case in context among those recent and older authorities, and it would help explain the statutory framework at issue and factual background, upon which nondelegation cases are decided. It is not an exaggeration to predict Congress will look to this decision when it drafts future laws.

---

[2] *HISA Announces Selection of Drug Free Sport International as Partner to Build Independent Anti-Doping and Medication Control Enforcement Agency*, Horseracing Integrity and Safety Authority (May 3, 2022) https://static1.squarespace.com/static/604f6ab712afe14e11227976/t/62712d0a4e033e08bd5a4020/1651584266128/HISA+ADMC+Agency+Release.pdf.

6

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................... 3
REQUEST FOR ORAL ARGUMENT ........................................................ 6
TABLE OF AUTHORITIES .................................................................... 9
JURISDICTIONAL STATEMENT ........................................................ 12
ISSUES PRESENTED........................................................................... 14
INTRODUCTION ................................................................................. 15
STATEMENT OF THE CASE ............................................................... 17
   I.  The Act was passed without congressional due diligence. ......... 18
   II. HISA grants unprecedented power to a private entity ............... 20
   III.This lawsuit seeks to vindicate the Horsemen's rights. ............. 25
STANDARD OF REVIEW ..................................................................... 28
SUMMARY OF ARGUMENT ................................................................. 28
ARGUMENT ........................................................................................ 31
   I.  HISA violates the nondelegation doctrine because the FTC does
      not determine the regulatory rules by approving, disapproving,
      and modifying them and because the FTC is not given proper
      oversight of the Authority. ............................................................. 31
      A. HISA fails the legal standard for delegating legislative power to
         a private entity. ........................................................................ 31
      B. Under HISA, the Authority determines the regulatory rules,
         and the FTC is subordinate to it because it cannot draft or
         modify them. ............................................................................ 34
      C. The FTC does not exercise sufficient authority and surveillance
         over the Authority. ................................................................... 42
      D. The nondelegation doctrine is alive and well and prohibits
         novel regulatory schemes like HISA. ....................................... 49
      E. HISA is a novel structure beyond any prior delegation............ 53
         1. HISA exceeds the statute in *Amtrak I*, which enjoined a
            similar scheme. .................................................................. 54
         2. HISA exceeds the delegation made to FINRA. .................... 55
      F. Other nondelegation cases are inapposite because government
         action was conditioned on private party acceptance and not the
         other way around, as in HISA. ................................................. 59
         1. This case is not controlled by *Texas v. Rettig*........................ 59
         2. This case is not controlled by other cases cited below. ......... 64

3. *Boerschig v. Trans-Pecos Pipeline* does not foreclose a nondelegation claim................................................................67

II. HISA violates the Due Process Clause because it gives economically self-interested actors the power to regulate their competitors. ....................................................................................68

CONCLUSION........................................................................................73

CERTIFICATE OF SERVICE ..............................................................75

CERTIFICATE OF COMPLIANCE .....................................................75

# TABLE OF AUTHORITIES

**Cases**

*Agendia, Inc. v. Azar*, 420 F. Supp. 3d 985 (C.D. Cal. 2019) .................35

*Agendia, Inc. v. Becerra*, 4 F.4th 896 (9th Cir. 2021)..............................36

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ................................................................................44

*Aslin v. Fin. Indus. Regul. Auth., Inc.*, 704 F.3d 475 (7th Cir. 2013).....56

*Ass'n of Am. R.Rs. v. Dep't of Transp.*, 896 F.3d 539 (D.C. Cir. 2018) ...37

*Ass'n of Am. R.Rs. v. Dep't of Transp..*, 821 F.3d 19 (D.C. Cir. 2016) ....70

*Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666 (D.C. Cir. 2013)..................................................................................................*passim*

*Austin Mun. Secur., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676 (5th Cir. 1985)....................................................................................57

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ...............................47

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020)....................49

*Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701 (5th Cir. 2017) ............................................................. 49, 51, 67-68

*Bowsher v. Synar*, 478 U.S. 714 (1986).....................................................15

*Brackeen v. Haaland*, 994 F.3d 249 (5th Cir. 2021) ...............................52

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................47

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).... 31-33, 48, 51-53, 64, 69, 71, 73

*City of Dallas v. the Federal Communications Commission*, 165 F.3d 341 (5th Cir. 1999)....................................................................................38

*Clinton v. City of New York*, 524 U.S. 417 (1998).............................38, 39

*Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218 (5th Cir. 2022)....................................................................................46

*Cook v. Ochsner Found. Hosp.*, 559 F.2d 968 (5th Cir. 1977)................66

*Currin v. Wallace*, 306 U.S. 1 (1939)................................................. 64-65

*Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43 (2015) ...........15, 35, 52

*Eubank v. City of Richmond*, 226 U.S. 137 (1912) ................................69

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667 (D.C. Cir. 2008)...............................................................................................16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010).35

*Gundy v. U.S.*, 139 S. Ct. 2116 (2019)...................................32, 50, 51, 52

*Humphrey v. Baker*, 848 F.2d 211 (D.C. Cir. 1988)...............................39

*In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110
   (D.C. Cir. 2008) ...................................................................56
*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) ..................................*passim*
*Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc. v.*
   *Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406 (6th Cir. 1994) ..........66
*Krielow v. La. Dep't of Agric. & Forestry*, 125 So. 3d 384 (La. 2013) .....37
*Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949) 12
*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ......15
*Luminant Generation Co., LLC v. EPA*, 675 F.3d 917 (5th Cir. 2012)...40
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec.*
   *Dealers, Inc.*, 616 F.2d 1363 (5th Cir. 1980)...................................57, 58
*N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494 (2015) .............71
*Paul v. United States*, 140 S. Ct. 342 (2019)..........................................51
*Pittston Co. v. U.S.*, 368 F.3d 385 (4th Cir. 2004) ......................31, 37, 66
*Planned Parenthood SE, Inc. v. Strange*, 9 F. Supp. 3d 1272 (M.D. Ala.
   2014).............................................................................................37
*R. H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952).....................59
*Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414
(4th Cir. 2016) .........................................................................55
*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) 45
*Sequoia Orange Co. v. Yeutter*, 973 F.2d 752 (9th Cir. 1992) ................66
*Sierra Club v. Lynn*, 502 F.2d 43 (5th Cir. 1974) ...................................41
*Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir. 1983)...........................41, 48
*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637
   F.3d 112 (2d Cir. 2011)..................................................................56
*State v. Williams*, 198 Wis. 2d 516 (1996) ............................................15
*Sullo & Bobbitt, P.L.L.C. v. Milner*, 765 F.3d 388 (5th Cir. 2014).........28
*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940) .......*passim*
*Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705 (D.C. Cir.
   1977).............................................................................................61
*Texas v. Comm'r*, 142 S. Ct. 1308 (2022) ........................................53, 64
*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016)...........................................40
*Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021) .......................59, 60, 61, 62
*Texas v. Rettig*, 993 F.3d 408 (5th Cir. 2021) ..............................36, 51, 63
*United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989).....................48, 66
*United States v. Rock Royal Coop., Inc.*, 307 U.S. 533 (1939) ...............66
*Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116
   (1928)............................................................................................69

*Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015) ..................53

**Statutes**

15 U.S.C. § 78c ..........................................................................58

15 U.S.C. § 78s ..........................................................................56

15 U.S.C. §§ 3051-3060 ....................................................*passim*

28 U.S.C. § 1331 ........................................................................12

28 U.S.C. § 1337 ........................................................................12

28 U.S.C. §§ 2201-2202 ............................................................12

Percy-Gray Racing Law, 1895 N.Y. Laws, Ch. 570 .................18

**Other Authorities**

166 Cong. Rec. H4980 (daily ed. Sept. 29, 2020) ......................... 18-19, 72

Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J.L. & Pub. Pol'y 931, 944 (2014) ....................................................49

Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. R. 251, 318 (2014) ..............................................................................51

Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18 (1940) ...............................................................................47

**Rules**

Fed. R. App. P. 4(a)(4) ..............................................................13

Fed. R. Civ. P. 12(b)(6) .............................................................28

Fed. R. Civ. P. 56 ......................................................................28

Fed. R. Civ. P. 57 ......................................................................12

Fed. R. Civ. P. 65 ......................................................................12

**Constitutional Provisions**

U.S. Const. art. I, § 1 ............................................................18, 29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because this claim presents a federal question under Article I, Section 1 of the Constitution. The district court also had jurisdiction pursuant to 28 U.S.C. § 1337 because HISA purports to regulate commerce.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 2201-2202 and Fed. R. Civ. P. 57 to grant a declaratory judgment because an actual controversy exists among the parties. The district court had jurisdiction pursuant to Fed. R. Civ. P. 65 to grant injunctive relief and had jurisdiction specifically to enjoin Defendants-Appellees Lina M. Khan, Noah Joshua Phillips, Rebecca Kelly Slaughter, and Christine S. Wilson under *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949), because the statute conferring power on them to take action in the sovereign's name is unconstitutional.

On April 19, 2022, the district court entered an order dismissing the Texas anti-commandeering doctrine claim and a Final Judgment in the case, and the Horsemen filed their notice of appeal. ROA.1532-35. On April 25, 2022, the district court entered an updated Final Judgment recognizing that all claims in the action had been disposed of and,

thereby, perfecting the Horsemen's notice of appeal. ROA.1719. On May 12, 2022, Texas filed its amended notice of appeal. ROA.1913-14.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. *See also* Fed. R. App. P. 4(a)(4).

## ISSUES PRESENTED

1. Whether HISA violates the nondelegation doctrine found in Article I, Section 1 of the U.S. Constitution by delegating legislative power to a private entity.

2. Whether HISA violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution by delegating legislative power to a private entity with economically self-interested actors who compete against those they regulate.

# INTRODUCTION

"[E]veryone should pay close attention when Congress 'sponsors corporations that it specifically designates *not* to be agencies or establishments of the United States Government.'"

*Dep't of Transp. v. Ass'n of Am. R.R.,* 575 U.S. 43, 57 (2015) ("*Amtrak II*") (Alito, J., concurring).[3]

In our system of government, "checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar*, 478 U.S. 714, 722 (1986). They are also "frequently inconvenient, particularly on the person or the institution being checked and balanced."[4] President Woodrow Wilson's solution to this supposed "'problem' of congressional gridlock and the burden of popular accountability" was to create a fourth branch of government, unencumbered by those inconveniences: administrative agencies. *Jarkesy v. SEC*, 34 F.4th 446, 459, n.10 (5th Cir. 2022). But those agencies are constrained by the Administrative Procedure Act, the Freedom of Information Act, the Federal Advisory Committee Act, and various other tools of democratic transparency and accountability.

This led to the rise of what Justice Kavanaugh has warned against

---

[3] Quoting *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 390 (1995) (cleaned up).
[4] *State v. Williams*, 198 Wis. 2d 516, 541 (1996) (Bablitch, J., concurring).

as "the fifth branch of federal government," composed of "novel policy inventions and corresponding structures" trying to evade these limits on regulatory capture. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 700 (D.C. Cir. 2008) (Kavanaugh, J., dissenting).

The problem is that sometimes Congress *wants* a regulatory authority run by industry insiders and *wants* to give industry elites the freedom to regulate their industry without all the inconveniences of democracy. That's what Congress wanted when it passed the Horseracing Integrity and Safety Act, empowering an elite club of industry insiders to regulate horseracing nationwide.

Thus, Congress conspired to create and empower a private, unaccountable, non-profit organization, the Horseracing Integrity and Safety Authority, to write and enforce rules for the industry. After the Congressional Research Service reminded HISA's drafters they could not, in fact, give the power to make and enforce federal law to a private entity *carte blanche*, the sponsors responded with a fig-leaf of agency oversight from the Federal Trade Commission, which has no competence regulating horseracing.

But the drafters were caught in a trap: if they gave the FTC real

oversight powers and put the Authority in a subordinate, advisory role, that would defeat the goal of an Authority free to regulate at will. And if the FTC had zero role, it would be obviously unconstitutional.

Thus, Congress tried to give the FTC as little power as possible. Under HISA, the Authority writes the rules, and the FTC takes public comments and then conducts a compliance check against HISA's zones of authority. However, the FTC may not propose rules on its own, may not conduct a substantive policy analysis of whether the Authority's proposed rules are good rules, and may not modify the rules in response to public comments.

The question in this case is whether this novel regulatory scheme survives the private nondelegation doctrine and the Due Process Clause. It does not. HISA delegates unprecedented power to a private entity with laughably little governmental oversight.

## STATEMENT OF THE CASE

With little fanfare and no Senate debate, HISA nationalized regulation of the horseracing industry, which state racing commissions had regulated for over 125 years. *See, e.g.,* Percy-Gray Racing Law, 1895

N.Y. Laws, Ch. 570. But instead of writing the rules governing the industry itself, or having a federal agency do it, Congress unconstitutionally delegated its legislative authority to a newly created private entity, the Horseracing Integrity and Safety Authority. 15 U.S.C. § 3052(a). Plaintiffs brought this lawsuit to challenge this delegation of legislative authority to a private entity as a violation of Article I, Section 1 of the U.S. Constitution, which states that, "All legislative Powers herein granted shall be vested in a Congress of the United States," as well as a violation of the Due Process Clause of the Fifth Amendment.

## I.    The Act was passed without congressional due diligence.

In 2020, the elites of the horseracing world took advantage of circumstances to lobby Congress to give them power to set the rules for the rest of the industry. They used a string of unfortunate horse deaths at Santa Anita Racetrack in California as a pretext for gaining power over their competitors, the thousands of horsemen who eke out a living in the industry and who are members of Plaintiffs' associations. Congressman Frank Pallone accurately summarized the coalition of animal rights advocates and industry elites who lobbied for HISA's passage: "[T]he Humane Society, the Jockey Club, the Breeders' Cup,

Animal Welfare Action, [and] several racetracks." ROA.330.[5] The Jockey Club had long sought to purge the industry of horsemen whose net worth did not allow them membership in their club, and HISA was the perfect vehicle for doing so.[6]

On September 8, 2020, this small group of industry elites conspired with congressional leaders to incorporate a new private entity the night before a bill was introduced to imbue this private entity with vast powers. ROA.580-85. The Authority incorporation documents created a shadowy, multi-layered process that made it impossible to know who selected members of the Nominating Committee, which then selected preordained board members to run the Authority, and why. ROA.527-34, 499-502.

The very next day, in a scripted announcement, both House and Senate sponsors introduced legislation giving the actions of this new organization the force of federal law. ROA.771-72. In earlier iterations of HISA, Congress had been told by the Congressional Research Service

---

[5] 166 Cong. Rec. H4980 (daily ed. Sept. 29, 2020) (statement of Rep. Pallone).

[6] Jockey Club chairman Stuart Janney even went as far as to hire a private investigator to drum up federal prosecution charges against some of his competitors for doping horses. ROA.547-68. In one case, the United States recently confessed error over whether it could prosecute a veterinarian complying with state regulations for federal misbranding of drugs and requested that the Supreme Court vacate the judgment below, which it did. *Rojas v. United States*, S. Ct. Dkt. No. 20-1594.

that such a bill potentially ran afoul of the nondelegation doctrine. ROA.802. Undeterred, Congress plowed forward, slapping on a veneer of supposed oversight by the FTC but denying the agency any real ability to do the job. 15 U.S.C. § 3053. The House of Representatives held one committee hearing and then passed the measure through the House on a voice vote with no debate. ROA.547. On the Senate side, sponsors avoided any mention of the unpleasant constitutional problem by holding no public hearings. Instead, they slipped the Act into the 2,000-page, must-pass, end-of-year COVID-19 relief and appropriation bill, the Consolidated Appropriations Act, 2021, where it received no debate. Pub. L. No. 116-260 (H.R. 133), §§ 1202-11, codified at 15 U.S.C. §§ 3051-3060 (signed into law Dec. 27, 2020).

## II.   HISA grants unprecedented power to a private entity.

HISA delegates to the Authority, a private, non-governmental, non-profit corporation, the power to promulgate nationwide rules regulating all facets of the horseracing industry. These rules preempt existing state regulations that were promulgated by state racing commissions. Further, the private Authority may collect fees from private members of the horseracing industry to fund its activities, and it may investigate and

enforce alleged rule violations with fines, suspensions, and civil lawsuits brought in its own name. *See, generally,* 15 U.S.C. §§ 3051-60.

HISA unconstitutionally delegates solely to the private "governing corporate documents of the Authority" the power to select a seven-member nominating committee, consisting of private citizens who are "independent members selected from business, sports, and academia." *Id*. at § 3052(d)(1). Thus, the nominating committee neither contains governmental officials nor is it appointed by governmental officials.

Next, HISA delegates solely to the nominating committee the power to select the board members of the Authority and the members of two standing committees that provide advice and guidance to the board. *Id*. at § 3052(d)(3). The board of directors and the standing committees neither contain governmental officials nor are they appointed by governmental officials.

The nine-member board of directors consists of four members from the horseracing industry and five members from outside it (but selected by a nominating committee chosen by insiders). *Id*. at § 3052(b)(1). The board has the sole power to govern the Authority, which is a "private, independent, self-regulatory, nonprofit corporation." *Id*. at § 3052(a).

HISA unconstitutionally delegates legislative power to the Authority to regulate the horseracing industry by "developing and implementing a horseracing anti-doping and medication control program and a racetrack safety program." *Id*. This legislative power is expansive: it includes "independent and exclusive national authority" over the "safety, welfare, and integrity" of racehorses and "all horseracing safety, performance, and anti-doping and medication control matters." *Id*. at § 3054(a)(2). The private Authority maintains jurisdiction to regulate all "trainers, owners, breeders, jockeys, racetracks, veterinarians, [and other] persons . . . licensed by a State racing commission" who compete in races having a substantial relation to interstate commerce. *Id*. at § 3051(6). This group of regulated individuals, entities, and employees includes virtually all people involved in Thoroughbred horse racing in the United States. HISA allows for other breeds of horses to be opted into its jurisdiction by unconstitutionally delegating the decision to either a state racing commission or a private organization governing the breed. *Id*. at § 3051(4).

The Authority exercises its legislative powers through its exclusive ability to draft rules governing the horseracing industry. *Id*. at § 3053(a).

22

Those rules are then published in the Federal Register for public comment, as if they had been drafted by a governmental agency. *Id*. at § 3053(b)(1), (c)(1), and (d)(2).

In a vain attempt to rectify its delegation problem, Congress provided that the rules promulgated by the Authority must be submitted to the FTC. *Id*. at § 3053(a). But the FTC's role in this process is that of a rubber stamp. It does not develop or implement federal regulatory authority but, instead, publishes the Authority's regulations for notice-and-comment rulemaking. *Id*. at § 3053(b). The FTC may not proactively draft rules to regulate the horseracing industry. *Id*. at § 3053(a). Nor may it modify rules drafted by the Authority. *Id*. at § 3053(c)(1).

Instead, the FTC may only "approve or disapprove" rules that have already been drafted by the Authority. *Id*. And it has only 60 days in which to make this determination. *Id*. If the FTC wants to modify a rule, it must "make recommendations to the Authority" to do so and hope the Authority takes its advice. *Id*. at § 3053(c)(3).

Furthermore, even the FTC's power to disapprove a rule from the Authority is practically proscribed by Congress because the FTC "*shall* approve a proposed rule . . . if [it] finds that the proposed rule . . . is

consistent with—(A) this Act; and (B) applicable rules approved by the [FTC]." *Id.* at § 3053(c)(2) (emphasis added). Therefore, as long as the Authority rule falls within the categories over which it is given jurisdiction, the FTC cannot disapprove the rule based on the exercise of its own independent policy judgment. It must capitulate to the Authority's decision. In fact, the only rulemaking authority maintained by the FTC at all is the ability to issue emergency rules, or interim final rules, *id.* at § 3053(e), but this power is extremely limited by the Administrative Procedures Act, which requires the agency to show "good cause" to find that notice-and-comment would be impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b)(B). Because FTC power is so neutered compared to that of the Authority it supposedly supervises, the district court aptly described the "unusual nature of the FTC–Authority relationship." ROA.1507.

In addition, HISA delegates the legislative power to tax and spend to the Authority by directing it to collect revenue from those it regulates. 15 U.S.C. § 3052(f). The Authority initially charges state racing commissions their proportionate share of the fees needed to operate the Authority, *id.* at § 3502(f)(1)(C), and if a racing commission declines to

collect funds, then the Authority charges fees directly to horsemen. *Id*. at § 3052(f)(3).

HISA also delegates to the Authority federal subpoena and investigatory powers to pursue civil violations within its jurisdiction. *Id*. at § 3054(h). An unprecedented feature of this power is that it is unfettered by any oversight from the FTC. Thus, the private Authority can utilize the power of the federal government to issue subpoenas to and investigate other private actors unchecked.

In addition, HISA delegates to the Authority the power to establish its own civil penalties for violations of its rules. *Id*. at § 3054(i).

Finally, HISA delegates to the Authority the power to initiate civil enforcement actions on its own behalf in court, asserting the power of the federal government to enforce its rules. *Id*. at § 3054(j). This power, too, is exercised with no input from the FTC.

In summary, HISA gives tremendous power to a private entity to regulate virtually every aspect of the Horsemen's business, and it relegates the FTC to a purely rubber-stamp role in the process.

## III.   This lawsuit seeks to vindicate the Horsemen's rights.

On March 15, 2021, the Horsemen filed this lawsuit, raising four

constitutional violations—the private nondelegation doctrine, the public nondelegation doctrine, the appointments clause, and the due process clause—and they filed a motion for preliminary injunction. ROA.38-65, 124-50. After negotiations with Defendants-Appellees, the Horsemen agreed to withdraw their motion for preliminary injunction in return for an agreed-upon briefing schedule on dispositive motions. ROA.211-15. On April 30, 2021, the Horsemen filed their motion for summary judgment on the grounds that HISA violates the private nondelegation doctrine and the due process clause of the constitution. ROA.449-83. The Authority and the FTC, respectively, filed motions to dismiss. ROA.317-56, 415-45. Briefing closed on June 18, 2021. ROA.965-87.

In the meantime, the FTC issued its procedural rule governing the submission of Authority rules. ROA.1080, 1087-94. The Authority drafted its racetrack safety program regulation, ROA.1080, ROA.1098-1122, which was rubberstamped by the FTC and goes into effect July 1, 2022. ROA.1395-1446. In its approval order, the FTC admitted that its limited statutory role did not allow it to propose regulations to address the public comments that it found to be "useful" and "constructive": "[T]he Commission's statutory mandate to approve or disapprove a proposed

Authority rule is limited to considering only whether the proposed rule 'is consistent with' the Act and applicable Commission rules." ROA.1402, 1412, 1417-18, 1445. The FTC can only cajole, sit, and wait: "The Commission will welcome future proposed rule modifications that the Authority decides to submit in response to the useful comments received." ROA.1412, 1445. Further, the Authority missed its congressionally-mandated deadline to submit its anti-doping and medication control program regulation, 15 U.S.C. § 3055(c)(1), and, instead, announced that it was unilaterally amending the effective date set by HISA for that program from July 1, 2022 to January 1, 2023. ROA.1124. Because it is forced to sit and wait, the FTC can do nothing to rectify this brazen violation of the statute.

On February 16, 2022, the district court held a hearing on the three dispositive motions, allowing counsel for amici the American Quarter Horse Association (AQHA) and North American Association of Racetrack Veterinarians (NAARV) to split time with counsel for the Horsemen. On March 31, 2022, the district court allowed the State of Texas and the Texas Racing Commission (collectively, "Texas") to intervene on the side of the Horsemen, join in their motion for summary judgment, and assert

an additional claim that HISA violates the anti-commandeering doctrine. ROA.1451-65. The same day, the district court issued its opinion recognizing the "compelling" arguments made by the Horsemen, ROA.1488, but reasoning that it lacked the authority to overturn what it viewed as persuasive precedent from this Court. ROA.1466-1525. On April 19, 2022, the district court entered its order dismissing the Texas anti-commandeering doctrine claim, and the Horsemen immediately filed their notice of appeal. ROA.1532, 1534. On May 12, 2022, Texas filed its amended notice of appeal. ROA.1913-14.

## STANDARD OF REVIEW

This Court reviews a district court's "holdings on constitutional and other legal questions de novo," "applying the same standard" for summary judgment and motions to dismiss "on appeal as that applied below." *Sullo & Bobbitt, P.L.L.C. v. Milner*, 765 F.3d 388, 391-92 (5th Cir. 2014); *see also* Fed. R. Civ. P. 12(b)(6) and 56.

## SUMMARY OF ARGUMENT

HISA's delegation of power to the Authority is unprecedented.

Never before has a court upheld a delegation of power to a private entity that prohibits the government from both drafting regulations on the front end and modifying them on the back end. These are the essence of "legislative Powers," U.S. Const. art. I, § 1, and they are unlawfully given to an unaccountable private entity by HISA. Supreme Court law requires the government to determine the rules and places private entities in a subordinate role. But HISA allows the private entity to determine the rules and places the FTC in a subordinate role.

In addition, HISA fails to give the FTC true oversight of the Authority. The FTC has no experience with, and zero expertise in, the horseracing industry, so it would be hard-pressed to oversee the Authority even if it were given a statutory framework with which to do so. But it was not given such a framework. The statute permits only consistency review, meaning it can only disapprove rules proposed by the Authority if they are not consistent with HISA. But HISA itself provides only a general framework to the Authority, outlining two areas in which it may act: racetrack safety and anti-doping. How the Authority chooses to exercise its powers and draft regulations within those two subject areas is largely left to its private discretion. Accordingly, the FTC cannot

exercise its policy judgment to reject Authority regulations. As long as the regulations fall within the general framework of HISA, the FTC is forced to give them its rubber stamp.

As the district court found, "HISA creates a novel regulatory scheme[, and] the parties agree that HISA breaks new ground." ROA.1466. The district court conceded that "the Fifth Circuit has not yet confronted a scheme like HISA." ROA.1518. Indeed, the district court acknowledged "the Horsemen make compelling arguments that HISA goes too far." ROA.1488.

But the district court misinterpreted this Court's precedent and ultimately concluded "only appellate courts may expand or constrict their precedent." *Id*. It appealed to this Court for review: "Perhaps the Supreme Court or the Fifth Circuit will cabin their private-nondelegation precedent in light of HISA's reach." ROA.1524.

Properly applied, this Court's precedent counsels finding a nondelegation violation in this case, including its decision in *Jarkesy v. SEC*, 34 F.4th at 462, decided after the district court issued its opinion. For all these reasons, this Court should reverse the trial court decision and hold that HISA violates the nondelegation doctrine.

In the alternative, if this Court does not enjoin HISA under the nondelegation doctrine, it should do so under the Due Process Clause because HISA empowers private individuals to regulate their competitors.

## ARGUMENT

### I. HISA violates the nondelegation doctrine because the FTC does not determine the regulatory rules by approving, disapproving, and modifying them and because the FTC is not given proper oversight of the Authority.

#### A. HISA fails the legal standard for delegating legislative power to a private entity.

The standard for delegating legislative power to a private entity is that *any* delegation of legislative power is unconstitutional: "*Any* delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." *Pittston Co. v. U.S.*, 368 F.3d 385, 394 (4th Cir. 2004) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) (emphasis added).

*Carter Coal* controls this case because, in both instances, the statute delegated legislative power to a private entity. In *Carter Coal*,

large coal producers and a majority of miners were given the legislative power to set wage-and-hour regulations for all producers in the district: "The effect, in respect of wages and hours, is to subject the dissentient minority, either of producers or miners or both, to the will of the stated majority . . . ." 298 U.S. at 311. The Supreme Court found this to be "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* Thus, the Court enjoined the statute, and this Court should do so here.

In this case, the district court improperly applied the legal standard for delegating legislative power to a *public* entity to a delegation of legislative power to a *private* entity. *See* ROA.1489-91, 1494-96, 1500. The test for a public nondelegation violation is whether Congress gave the administrative agency an "intelligible principle" to guide the agency's exercise of authority. *Gundy v. U.S.*, 139 S. Ct. 2116, 2123 (2019); *Jarkesy*, 34 F.4th at 461. But that test for public agencies is different from the test applicable here.

The parties agreed at the hearing that the district court's use of the "intelligible principle" standard would be incorrect. As counsel for the FTC put it, the "first-line question is, has legislative power been delegated." ROA.1784:1. He continued, "if there's no delegation of legislative power, there's no need to analyze whether there's an intelligible principle." ROA.1787:17-18. Likewise, counsel for the Authority cabined the "intelligible principle" standard to public nondelegation claims: "We don't have a public nondelegation claim that they have raised. If they did, it would fail, because there's obviously plenty of intelligible principles in the statute." ROA.1818:10-12. Therefore, all parties agree the question of whether Congress gave an "intelligible principle" is unnecessary for this Court's ruling. The proper test is whether HISA delegates legislative power to the Authority or not.

The Supreme Court set forth the private nondelegation standard in the follow up case to *Carter Coal*: *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381 (1940), which upheld a statute allowing private code members in a locality to *propose* the minimum price of coal to a national commission, subject to the commission's *determination*: "The members of the code function subordinately to the Commission. It, not the code

authorities, determines the prices. And it has authority and surveillance over the activities of these authorities. Since law-making is not entrusted to the industry, this statutory scheme is unquestionably valid." 310 U.S. at 399. The power to determine prices in *Adkins* was the power of the governmental agency to "approve[ ], disapprove[ ], or modif[y]" the private entity's proposal. *Id.* at 388.

### B.     Under HISA, the Authority determines the regulatory rules, and the FTC is subordinate to it because it cannot draft or modify them.

The Constitution prohibits legislative delegations to a private entity unless 1) the government "determines" the regulatory rules through the power to "approve[ ], disapprove[ ], or modif[y]" rules proposed by the private entity. *Adkins*, 310 U.S. at 388, 399.

Under HISA, the Authority determines the rules for horseracing, not the FTC. However, when Congress grants a special role in rulemaking to a private entity, that entity cannot supplant the work of a governmental agency but can only "help a government agency make its regulatory decisions." *Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) ("*Amtrak I*") (vacated and remanded on

other grounds by *Amtrak II*).[7] Private entities may recommend policies, rules, or legislation, but then governmental actors who are charged with protecting the public interest must decide what becomes law. *See, e.g., Adkins*, 310 U.S. at 399. "[P]rivate parties must be limited to an advisory or subordinate role in the regulatory process." *Amtrak I*, 721 F.3d at 673.[8] But here the process is inverted: the Authority is driving the train. That is evident in four ways.

First, only the Authority may initiate rulemaking. If the FTC sees a problem in horseracing, it may suggest that the Authority send it a rule, but it is reduced to a role as "cajoler-in-chief." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 502 (2010). It has no independent freedom of action for permanent rule-making. In other words, the Authority alone sets the regulatory agenda. If the Authority simply decides not to propose a rule, even on a topic Congress has identified as

---

[7] Although *Amtrak I* was overturned by the Supreme Court, the Court did so only because it determined that, as a factual matter, the allegedly private entity in that case, Amtrak, was a public entity. *Amtrak II*, 575 U.S. at 54-56. Therefore, the reasoning of the circuit court opinion remains valid: when Congress delegates to a private entity the power to stop the government from writing rules, it violates the Constitution.

[8] *Accord Agendia, Inc. v. Azar*, 420 F. Supp. 3d 985, 992 (C.D. Cal. 2019) ("private parties may assist an agency provided the party functions subordinately to the agency").

needing rulemaking, the FTC is powerless to act. The Authority, not the FTC, determines the subjects of rule-making.

In March 2022, the Authority missed the deadline set in HISA to submit its anti-doping and medication control program regulation and, instead, announced that it was unilaterally changing the effective date for that program from July 1, 2022 to January 1, 2023. *Compare* 15 U.S.C. § 3051(14) *with* ROA.1124. This blatant rewrite of the law—with no consequences from the FTC—shows that it is the Authority that is exercising legislative power and not Congress (much less the FTC).

Second, the Authority, not the FTC, "determines" what goes in a rule. The Authority submits a rule to the FTC for review, but the law bars the FTC from modifying the proposed rule. 15 U.S.C. § 3053(c). Modification is the *sine qua non* of legislative power. The requirement that a governmental agency must be able to "approve[ ], disapprove[ ], *or modif*[*y*]" a private entity's proposal is the well-established standard in nondelegation law. *Adkins*, 310 U.S. at 388 (emphasis added); *see also Agendia, Inc. v. Becerra*, 4 F.4th 896, 903 (9th Cir. 2021); *Texas v. Rettig*, 993 F.3d 408, 415 (5th Cir. 2021) (Ho, J., dissenting from denial of rehearing en banc); *Ass'n of Am. R.Rs. v. Dep't of Transp.*, 896 F.3d 539,

546 (D.C. Cir. 2018) ("*Amtrak IV*"); *Amtrak I*, 721 F.3d at 671; *Pittston*, 368 F.3d at 394.[9]

HISA denies the FTC that power. If the FTC receives dozens of helpful comments on a rule, suggesting modifications while retaining the bulk, those suggestions go nowhere because the FTC has no power to make any changes. This is, in fact, exactly what happened with the Authority's inaugural rule governing racetrack safety. The FTC received 39 public comments from industry stakeholders, ROA.1401, which the FTC found "useful" and "constructive." ROA.1412, 1417-18, 1445. But the FTC was powerless to act on those comments because it could not modify the rule.

The importance of the power to modify is evident from *Adkins* itself, which established this standard. In that case, the Court found no delegation problem because a government agency, the National Bituminous Coal Commission, maintained the power, in effect, to rewrite coal prices. *Adkins*, 310 U.S. at 398. Unlike HISA, the statute in *Adkins* did not delegate to private entities an entire regulatory scheme. Local

---

[9] *Accord Planned Parenthood SE, Inc. v. Strange*, 9 F. Supp. 3d 1272, 1278 (M.D. Ala. 2014); *Krielow v. La. Dep't of Agric. & Forestry*, 125 So. 3d 384, 389 (La. 2013).

coal producer boards were limited in power to setting the minimum price of coal. The Coal Commission's power to modify minimum coal prices gave it full authority to set its own price, independent of the private entity recommendations. Thus, it was clear that the district boards "function[ed] subordinately to the Commission[, for i]t, not the code authorities, determine[d] the prices." *Id*. at 399. As the district court in this case concluded, "[B]ecause Congress withheld the FTC's ability to modify proposed rules, the Authority wields greater power than . . . the private entities in *Adkins*." ROA.1515.

The power to modify was important to this Court in another decision: *City of Dallas v. the Federal Communications Commission*, 165 F.3d 341, 357-58 (5th Cir. 1999). There, the FCC had issued a blanket rule allowing private video service operators to decide whether to carry a cable operator's video programming. *Id*. This Court decided the rule delegated too much power because the FCC failed to retain the ability to modify these "selective[ ]" decisions by private operators. *Id*.

An analogous case from the Supreme Court also illustrates why this is a delegation of "too much" legislative power to HISA. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Court ruled that a statute giving

the president a line-item veto was prohibited by Article I, Section 7. Among the reasons given for enjoining the Line Item Veto Act was that it represented the "functional equivalent of partial repeals of Acts of Congress." *Clinton*, 524 U.S. at 444. The Court enjoined this unconstitutional executive branch "exercise[ ] of legislative power." *Id*.

In other words, when the president was given only the ability to veto, or approve or disapprove a law, he was not exercising legislative power. But when he was also given the power to modify the law, he was exercising "legislative power," all of which is properly vested in Congress. *Id*. A constitutional violation occurred because the power to modify is greater than and different from the power merely to approve or disapprove. Editing a law in a piecemeal fashion is exercising "legislative power." Likewise, the power to modify rules in the nondelegation context is also greater than and different from the power simply to approve or disapprove them. *See Humphrey v. Baker*, 848 F.2d 211, 217 (D.C. Cir. 1988) (noting presidential recommendation of federal employee salary levels did not violate non-delegation because Congress retained power to modify or reject recommendations).

Third, only the Authority, not the FTC, determines whether a rule

is a good idea. Only the Authority has a policy-making role, which is another quintessentially governmental function. By law, the FTC may only check whether a proposed rule fits within the authorized topics mentioned in HISA. 15 U.S.C. § 3053(c)(2). If the Authority proposes a rule on racetrack safety that receives 10,000 negative comments and zero positive comments, the FTC must nevertheless approve it because it relates to a topic authorized for Authority rulemaking in HISA.

As this Court explained in *Texas v. EPA*, such consistency review means that the agency "must defer" to the proposal's "goals so long as [they] comply with the Act." 829 F.3d 405, 428 (5th Cir. 2016). This is more an adjudicative function rather than a legislative one, ROA.1515, which further illustrates the sheer scope of policymaking power given to the Authority. *See Luminant Generation Co., LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012) (stating when an agency reviews a proposed document only "for consistency with the Act's requirements," such review is only "ministerial" and is not an exercise of lawmaking power). Again, the FTC received "useful" and "constructive" comments on the inaugural racetrack safety rule but could do nothing with them because its role was limited to a consistency check, not a policy analysis.

Fourth, HISA's 60-day time limit for the FTC to receive public comments and approve or disapprove Authority regulations further evinces the shallowness of the FTC's role. 15 U.S.C. § 3053(c)(1). Such a time limit is structured to force the FTC into a rubberstamp role, with no time to conduct an independent policy or legal analysis. Again, HISA has turned the advisory role on its head: the FTC should be the one drafting the rules, and private entities should be the ones given a time period in which to comment on them.

Because the FTC cannot modify a proposed rule and cannot decline a proposed rule on policy grounds, even after a public comment period, it is exactly the sort of "rubberstamp" this Court rejected in *Sierra Club v. Sigler*, 695 F.2d 957, 962, n.3. (5th Cir. 1983) (citing *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974)) (federal agency may not "abdicate its statutory duties by reflexively rubber stamping a statement prepared by others")). In *Sigler*, this Court called government action adopting an environmental impact statement from a private consulting firm "rubberstamping" and affirmed that "an agency may not delegate its public duties to private entities." *Id*. The rubberstamp role was confirmed, in part, by the artificial time pressure put on the agency to

41

approve the private report. *Id*. Reflexive rubber stamping is exactly what is occurring in this case.

*Adkins* first asks who "determines" the law: the government or the private entity. 310 U.S. at 399. For all four of these reasons, the answer is the Authority. The Authority determines what topics are addressed, how they are addressed, and what policy they embody. The FTC determines only whether the rules it is given are consistent with the Act, and it must do so in a limited timeframe. Clearly, it is the Authority who "determines" the rules, and that violates the Constitution.

### C.    The FTC does not exercise sufficient authority and surveillance over the Authority.

*Adkins* next asks whether the government has "authority and surveillance" over the Authority. *Id*. Here again, HISA fails the test. Even the district court acknowledged "the unusual nature of the FTC–Authority relationship." ROA.1507. Unusual is an understatement.

First, the FTC has no idea about the industry it is supposed to oversee. The FTC admitted in its briefing that it "lacks independent expertise in the horseracing industry." ROA.426. As the district court explained, "Historically, valid private-public partnerships have involved agencies that possess independent expertise over the industry they are

tasked with regulating." ROA.1506. The court recognized this important factual distinction between this case and *Adkins* and the Maloney Act cases (discussed below): "For example, the National Bituminous Coal Commission had expertise in the coal industry, and the SEC has expertise in securities regulation." *Id*. Also, Amtrak was regulated by a body with expertise in the railroad industry, the Federal Railroad Administration, yet the D.C. Circuit still enjoined the delegation. *Amtrak I*, 721 F.3d at 671. Only in the case of HISA were the keys to the kingdom given to a private entity, while the guard put in charge was given a blindfold.

Put bluntly, the FTC has no experience, expertise, or connection with the horseracing industry whatsoever. The FTC's "unique dual mission [is] to protect consumers and promote competition." ROA.460, 468. "The FTC protects consumers by stopping unfair, deceptive[,] or fraudulent practices in the marketplace." *Id*. The FTC promotes competition "[b]y enforcing antitrust laws." *Id*. The "parties agree that the FTC lacks pre-existing expertise in thoroughbred horseracing." ROA.1506. By housing the Authority within the FTC, HISA intentionally put the FTC at a competitive disadvantage in evaluating the merit of

regulations proposed by the Authority because the Authority contains four members appointed directly from the horseracing industry. 15 U.S.C. § 3052(b)(1)(B)(i).[10]

The Authority admits the FTC will have to rely on it to supply its own expertise in the industry. ROA.838, 844 (citing *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 442 (D.C. Cir. 2018)). But it and the district court's decision fail to see how "incorporating 'technical standards'" into a larger regulation differs markedly from entrusting the regulatory scheme of an entire industry to a private entity with expertise while leaving the government devoid of any knowledge. ROA.1498. Effective surveillance and authority are impossible with no knowledge of the industry to be overseen.

Second, the Authority chooses its own members without any oversight from the FTC. Four Authority board members are chosen directly from the horseracing industry, and five are supposed to be "independent" and "selected from outside the equine industry." 15 U.S.C.

---

[10] Appellant National Horsemen's Benevolent and Protective Association advocated for the creation of an office to oversee and establish uniform laboratory protocols within an agency that had expertise in horses: the United States Department of Agriculture National Veterinary Services Lab. ROA.768. But Congress intentionally decided instead to house oversight at the FTC, raising the specter that it intended for the Authority to have *no* meaningful oversight.

§ 3052(b)(1). But the five so-called "independent" directors on the Authority board include a former board member of Churchill Downs Racetrack, home to the Kentucky Derby, and a former president of the New York Racing Association. ROA.783. These two hardly qualify as independent from the industry under a layman's definition of independence, but the FTC is powerless to explore this question. Only the completely private nominating committee may appoint Authority board members. This situation is problematic because, in many ways, personnel is policy, and the powers of appointment and removal are the power to determine how law is made and enforced. *See, generally, Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020).

Under HISA, the FTC is powerless to remove an Authority board member even for cause. In the Act, Congress delegated the powers of terminating an Authority board member and filling a board vacancy to the Authority Bylaws. 15 U.S.C. § 3052(b)(3). The Bylaws state that a board member may be removed only for cause and by a unanimous vote of all other board members. ROA.396. The Bylaws then define "for cause" so narrowly that even a board member convicted of a felony cannot be removed, so long as it did not involve moral turpitude. *Id*. Regardless, the

FTC is completely shut out of the removal process, no matter how bad the acts committed by Authority board members. Thus, the FTC does not have "authority and surveillance" over Authority board members.

Third, the Authority has total independence over its budget, which it is legally authorized to exact from those whom it regulates. In this way, the Authority is much like the Consumer Financial Protection Bureau, which can set and collect fees to support the budget it determined it needs without pesky Congressional oversight, authorization, or appropriation. *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 222 (5th Cir. 2022) (Jones, J., concurring) ("[T]he CFPB's budgetary independence is antithetical to the constitutional origins of the Appropriations Clause; contrary to the Constitution's structural allocation of powers; unsupported by the funding structure of any previous federal agency; and indefensible . . . .").

HISA grants the same financial independence to the Authority: it may set its own budget, determine the fees necessary to fund that budget, and collect those fees from states or directly from horsemen upon pain of disqualification from the industry. The FTC has no role in any of this, even as resource allocations reflect policymaking and enforcement

46

priorities, and high fees may drive some Horsemen out of the industry entirely (and nothing prevents the Authority from setting those fees with precisely that goal in mind).

Fourth, the Authority has not only legislative power but also governmental enforcement power without oversight. The Authority is empowered to open investigations and issue subpoenas with the force of law without any oversight from the FTC. 15 U.S.C. § 3054(h). Of course, often the power to investigate and charge has the desired effect without any further action needed. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963); Robert H. Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18 (1940). The private Authority can utilize the power of the federal government to issue subpoenas to and investigate other private actors unchecked. HISA also delegates to the Authority the power to initiate civil enforcement actions on its own behalf in court, asserting the power of the federal government to enforce its rules, in violation of the Appointments Clause per *Buckley v. Valeo*, 424 U.S. 1, 138-40 (1976). 15 U.S.C. § 3054(j). This power, too, is exercised with no input from the FTC. Admittedly, if the Authority levels civil penalties administratively, those are subject to review by an ALJ and the FTC, but that will likely

be as much of a rubber-stamp as everything else.

Fifth, this Court should be especially skeptical because the private entity's directors have a personal interest in the outcome of the decisions taken. *Carter Coal*, 298 U.S. at 311; *Sigler*, 695 F.2d at 962, n.3. A number of Authority board members represent interests that compete in the horseracing business against the horsemen they regulate. *See infra* Part II.

In sum, the FTC lacks the requisite authority and surveillance under HISA. In contrast, a statute analyzed by the Third Circuit shows how oversight could be drafted in a constitutional manner. That court upheld a delegation to a private entity when the government agency had "considerable" and "pervasive" oversight. *United States v. Frame*, 885 F.2d 1119, 1128-29 (3d Cir. 1989). In that case, an agency with industry expertise had the power of appointment and removal of board members, a right to attend all board meetings, a right to review an annual fiscal audit, and power to veto all "budgets, plans or projects" and "contracts." *Id.* Furthermore, Congress itself set the level of fees on industry participants to fund the board, and the private board had zero rulemaking role. *Id.* Comparing this statute to HISA further highlights

48

how HISA clearly fails the second requirement from the *Adkins* standard.

### D.    The nondelegation doctrine is alive and well and prohibits novel regulatory schemes like HISA.

Though of an "old vintage," the private nondelegation doctrine "remains 'alive and well.'" *Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 707 (5th Cir. 2017) (quoting Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J.L. & Pub. Pol'y 931, 944 (2014)).

Recently, this Court enjoined a law for violating the nondelegation doctrine and declared that public "accountability evaporates if a person or entity other than Congress exercises legislative power." *Jarkesy*, 34 F.4th at 460. This Court in *Jarkesy* pointed out that correct reasoning does not look to how many times the Supreme Court has found nondelegation violations in the last eighty years: "We recognize that the Supreme Court has not in the past several decades held that Congress failed to provide a requisite intelligible principle." 34 F.4th at 462; *but see* ROA.1495, citing *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 446 (5th Cir. 2020). *Jarkesy* confirms that application of the nondelegation doctrine remains appropriate when an egregious set of facts presents itself: "But neither in the last eighty years has the Supreme Court

49

considered the issue when Congress offered no guidance whatsoever." *Id.* This case, like *Jarkesy*, presents such an egregious statute. Never before has any court upheld a delegation of authority to a private entity that prohibits the government from both drafting the rules initially and later drafting modifications because Congress has never before enacted such a statute. When presented with what the district court, putting it kindly, described as a "novel regulatory scheme," ROA.1466, which delegates unconstrained legislative power, *Jarkesy* counsels that a violation has occurred. *Id.* at 461-62.

This case is even easier than that in *Jarkesy* because *Jarkesy* was a public nondelegation case, not a private one. There, this Court found that Congress had provided the SEC no guidance for conducting enforcement proceedings internally and when to send them to an Article III court. 34 F.4th at 462. But delegations to a public entity have survived even under a bare congressional directive to regulate "in the public interest," so finding a public nondelegation violation, in most cases, would require a change in the interpretation of the "intelligible principle" standard. *Gundy*, 139 S. Ct. at 2129 (Gorsuch, J., dissenting).[11] Unlike

---

[11] In recent years, six different Supreme Court Justices have questioned whether this

its cousin, the private nondelegation doctrine requires no change at this Court or the Supreme Court for the Horsemen to succeed—only a reaffirmation that the principle is still viable, even if it is rarely transgressed.

The district court erred by implying otherwise. It pointed out that *Carter Coal*, the Supreme Court's seminal case in this area, was decided "[e]ighty years ago." ROA.1489. Also, the district court selectively quoted this Court's ruling in *Boerschig*: "'[T]his doctrine preventing governments from delegating too much power to private persons and entities is of old vintage, not having been used by the Supreme Court to strike down a statute since the early decades of the last century.'" ROA.1493 (quoting 872 F.3d at 707). However, the district court failed to continue quoting *Boerschig*, which went on to say of the private nondelegation doctrine that "its continuing force is generally accepted" and that "the doctrine remains alive and well." 872 F.3d at 707. *Accord Rettig*, 993 F.3d at 412

---

"intelligible principle" standard for public nondelegation is too deferential and should be overruled. *See Gundy*, 139 S. Ct. at 2141 (Gorsuch, J., dissenting, joined by Roberts, C.J. and Thomas, J.); *Gundy*, 139 S. Ct. at 2130-31 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting the denial of certiorari); Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. R. 251, 318 (2014) (describing the "intelligible principle" standard as "notoriously lax").

(Ho, J., dissenting from denial of rehearing en banc); *Brackeen v. Haaland*, 994 F.3d 249, 422 (5th Cir. 2021) (opinion of Duncan, J.), *cert. granted* 142 S. Ct. 1205 (2022).

Similarly, Appellees disparaged Supreme Court precedents on the nondelegation doctrine by calling them "*Lochner*-era cases." ROA.855, 913. But *Carter Coal* and its progeny are still good law and cannot be ignored because they "happened to be handed down during the same era as certain of the Court's now-discredited substantive due process decisions." *Gundy*, 139 S. Ct. at 2138 (Gorsuch, J., dissenting).

At the Supreme Court, Justices Alito and Thomas have reaffirmed the doctrine's ongoing vitality in recent years. *Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) ("By any measure, handing off regulatory power to a private entity is 'legislative delegation in its most obnoxious form.'" (quoting *Carter Coal*, 298 U. S. at 311)); *id.* at 88 (Thomas, J., concurring) ("[T]he 'private nondelegation doctrine' is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private."). More recently, those justices were joined by Justice Gorsuch in a statement again affirming *Carter Coal's* continued power. *Texas v. Comm'r*, 142 S. Ct.

1308, 1309 (2022) (Alito, J., statement respecting certiorari) ("To ensure the Government remains accountable to the public, it cannot delegate regulatory authority to a private entity."). And Chief Justice Roberts, joined by Justices Alito and Scalia, cited *Carter Coal* with the reminder, "[S]uch delegations threaten liberty and thwart accountability by empowering entities that lack the structural protections the Framers carefully devised." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 701 (2015) (Roberts, C.J., dissenting).

As the Horsemen point out in their introduction, avoiding those structural protections was by design here. As it did recently in *Jarkesy*, this Court should find a violation of the nondelegation doctrine in this case because the Court is likewise presented with a statute delegating unprecedented powers.

**E.    HISA is a novel structure beyond any prior delegation.**

The district court correctly concluded "HISA creates a novel regulatory scheme[, and] the parties agree that HISA breaks new ground." ROA.1466. HISA's novel scheme is evident when making an in-depth comparison between HISA and statutes in other private nondelegation cases.

1.   **HISA exceeds the statute in *Amtrak I*, which enjoined a similar scheme.**

HISA breaks new ground by going further than the scheme the D.C. Circuit enjoined in *Amtrak I*. There, a statute allowed both an allegedly private entity, Amtrak, and a governmental agency, the Federal Railroad Administration ("FRA"), to draft rules and regulations for the industry. 721 F.3d at 669-70. Then the statute allowed for each party, Amtrak and the FRA, to reject any rules proposed by the other. *Id*. at 696, 673-74. Therefore, the court noted Amtrak was given an "effective veto" over government. *Id*. at 671, 673–74. The circuit court held that the combination of these two elements—both the ability to draft rules and the ability to veto the government rules—constituted a violation of the nondelegation doctrine. *Id*. at 674.

HISA is even worse than the statute enjoined in *Amtrak I* because it denies the FTC the ability to draft rules. 15 U.S.C. § 3053. The district court stated that Amtrak and the FRA were on "equal footing" and that the Authority is less powerful than Amtrak because it needs FTC approval. ROA.1509. But unlike Amtrak, only the Authority may draft rules. 15 U.S.C. § 3053. Further, by withholding rules on a particular subject from the FTC, the Authority also wields an "effective veto" over

the government. *Amtrak I*, 721 F.3d at 671, 673–74. The role of the FTC is limited to a mere afterthought. The FTC is deprived of the primary purpose of including an agency in the statute in the first place: to draft the rules necessary to enforce the law.

### 2.    HISA exceeds the delegation made to FINRA.

HISA's novelty is also evident by contrasting it with the Financial Industry Regulatory Authority ("FINRA"). The district court stated that the Maloney Act, which created FINRA, "inspired the FTC–Authority relationship," ROA.1502. However, HISA goes far beyond the Maloney Act in its delegation to the Authority. Even the district court concluded that, "because Congress withheld the FTC's ability to modify proposed rules, the Authority wields greater power than FINRA . . . ." ROA.1515.

The Maloney Act delegated power from the Securities and Exchange Commission ("SEC") to the private National Association of Securities Dealers ("NASD") and its successor, FINRA. *Scottsdale Cap. Advisors Corp. v. FINRA*, 844 F.3d 414, 417 n.1 (4th Cir. 2016).

However, a review of the Maloney Act demonstrates that it, too, gave the government more power than HISA grants the Authority, including the power to modify proposed rules. The SEC could "abrogate,

add to, and delete from" NASD rules "as the Commission deems necessary or appropriate to insure the fair administration of the self-regulatory organization." 15 U.S.C. § 78s(c) (1976). The current version of the statute retains the SEC power to modify FINRA rules. 15 U.S.C. § 78s(c).[12] Unlike the FTC under HISA, the SEC retains the power to modify private entity rules; therefore, this Court should distinguish these cases upholding the Maloney Act under the private nondelegation doctrine.

Further, the SEC's review encompasses more than the limited consistency review of HISA because of the SEC's ability to modify. The SEC's power to modify comes with complete discretion. The district court incorrectly stated that "HISA's consistency review tracks the SEC's review of FINRA rules." ROA.1515. While it is true that both the Maloney Act and HISA require the government to approve rules if they are consistent with the respective acts, the requirement does not extend to modification under the Maloney Act. The SEC may, "by rule, abrogate, add to, and delete from [FINRA's proposed rules as it] deems necessary

---

[12] *See Aslin v. Fin. Indus. Regul. Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013) (confirming the power to modify); *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 116 (2d Cir. 2011) (same); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 112 (D.C. Cir. 2008) (same).

or appropriate to insure the fair administration of [FINRA] . . . ." 15 U.S.C. § 78s(c). By contrast, the FTC is powerless to ensure the fair administration of the Authority and cannot rewrite proposed rules as it deems necessary or appropriate. It is devoid of this necessary tool of "authority and surveillance" over the entity is supposed to oversee.

Indeed, this Court has pointed out the "extensive oversight, supervision, and control by the SEC." *Austin Mun. Secur., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 757 F.2d 676, 680 (5th Cir. 1985). "Congress granted the SEC broad supervisory responsibilities over" NASD and FINRA. *Id.* For example, "the SEC has broad sanctioning power. *Id.* The SEC can suspend or revoke the registration of the self-regulatory organization, or censure or restrict the activities, functions, and operations of the organization, a member, or an associate." *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 616 F.2d 1363, 1367 (5th Cir. 1980)).

Also, the "SEC may remove from office or censure any officer or director of a self-regulatory organization if it finds she has wilfully violated the rules or abused her position." *Id.* (citing 15 U.S.C. § 78s(g)(2)). "Finally, the SEC may bring an action to enjoin any activity

by the organization that violates the Exchange Act or rules promulgated thereunder." *Id.* (citing 15 U.S.C. § 78u(d); *Merrill Lynch*, 616 F.2d at 1367). These all represent extensive sanctioning powers that HISA does not give the FTC; instead, HISA gives enforcement powers to the Authority. These factual differences between the statutes further distinguish the Maloney Act cases.

Another difference between the Maloney Act and HISA is the undemocratic nature of the Authority. The Maloney Act gives the power to draft initial regulations to self-regulatory organizations, which are member organizations made up of thousands of individuals who trade securities on a particular exchange. 15 U.S.C. § 78c(a)(26). This factual scenario in which members regulate themselves is totally different from HISA, which gives power to a small, self-selecting group of horseracing elites to govern the rest of the industry. The latter violates the Due Process Clause, discussed in Part II *infra*.

Finally, the SEC-FINRA relationship differs profoundly from the FTC-Authority relationship because the SEC has almost a hundred years of expertise governing the securities industry, whereas, again, the FTC

has no experience governing the horseracing industry. For all these reasons, this Court should distinguish the Maloney Act cases.[13]

### F. Other nondelegation cases are inapposite because government action was conditioned on private party acceptance and not the other way around, as in HISA.

#### 1. This case is not controlled by *Texas v. Rettig*.

The district court was wrong to conclude that it was bound by this Court's decision in *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021), to uphold HISA's unprecedented delegation of regulatory authority. ROA.1504. HISA is very different from the private-public partnership at issue in *Rettig*.

In *Rettig*, this Court considered a private nondelegation doctrine challenge to the certification rule of the U.S. Department of Health and Human Services ("HHS"). 987 F.3d at 526. The certification rule imposed a small condition on a state's ability to obtain federal reimbursement for capitation rates that HHS paid to managed-care organizations ("MCOs") providing care to Medicaid patients. *Id.* at 524-25. The condition required

---

[13] This Court should also bear in mind that the three Maloney Act cases come from other circuits and do not bind this circuit. This Court has made only one favorable citation to one of the three cases, and that was in a footnote. *See Texas v. Rettig*, 987 F.3d 518, 532, n.12 (5th Cir. 2021) (citing *R. H. Johnson & Co. v. SEC*, 198 F.2d 690 (2d Cir. 1952)).

that an actuary meeting the qualification standards of the American Academy of Actuaries and following the practice standards of the Actuarial Standards Board certify the capitation rates in a state-MCO contract as actuarially sound. *Id.*

The *Rettig* Court concluded that the actuarial board functioned subordinately to HHS based on the presence of two factors: 1) HHS had "'reviewed and accepted' the Board's standards" when it incorporated them into the certification rule and 2) "HHS has the ultimate authority to approve a state's contract with MCOs" because even after a private actuary had certified capitation rates as actuarially sound, HHS still conducted an independent, multi-step actuarial-soundness review before deciding whether to approve the state-MCO contract. *Id.* at 533. Thus, HHS exercised supervision of the private entity on both the front end and the back end. On the front end, it independently reviewed the actuarial board's standards before deciding to incorporate them in the certification rule. And on the back end, HHS independently reviewed an actuary's actuarial-soundness determination before deciding whether to approve a state-MCO contract. As both this Court in *Rettig* and the district court in this case noted, "the subdelegated power in *Rettig* concerned only 'a small

part of the [contract] approval process' and that process was 'closely "superintended by HHS in every respect."' *Rettig*, 987 F.3d at 533 (citing *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 708 n.5 (D.C. Cir. 1977))." ROA.1504. The "reasonable conditions" in *Rettig* bear no resemblance to HISA's scheme, in which no federal decisionmaker knows the content of the Authority's rules beforehand, and the FTC has no power to modify those rules once submitted. 987 F.3d at 532.

First, HHS "reviewed and accepted" the actuarial board's standards *before* deciding to incorporate them in its certification rule. *Rettig*, 987 F.3d at 533. But neither the FTC, nor Congress, nor any other government official similarly reviewed and accepted any proposals from the Authority regarding the content of its regulations before bestowing upon it the power to craft federal law. Rather, HISA gives the Authority a blank check to determine the content of federal regulations.

The Authority can craft not just a "small part" of a regulation, but the entire regulatory scheme for the industry, including rules governing racetrack safety, anti-doping and medication control, the schedule of sanctions for violations, and the methodology for determining the fees that will fund the Authority. 15 U.S.C. § 3053(a). Further, the

61

Authority's regulations are not advisory or merely responses to "requests for input." *See Rettig*, 987 F.3d at 531. The FTC *must* publish all the Authority's rules in the Federal Register for public comment and it *must* approve and promulgate the rules so long as they are consistent with HISA and prior rules approved by the FTC. 15 U.S.C. § 3053(b)-(c).

Second, in *Rettig* HHS could decline to "approve a state's contract with MCOs" if it disagreed with the actuarial standard. 987 F.3d at 533. But the FTC has minimal power to prevent the Authority's rules from becoming federal law. So long as the rules do not violate HISA itself, the FTC is bound to promulgate them. 15 U.S.C. § 3053(c)(2). In other words, the FTC does not perform a substantive policy analysis of the rule's value, unlike HHS's substantive actuarial review.

Moreover, in *Rettig*, HHS was the entity that promulgated the certification rule in the first place, and the agency always had the power to revoke the certification rule if it objected to an actuarial standard. 987 F.3d at 533. It could have repealed the "Certification Rule's requirement that the Board's practice standards be followed." *Id.* at 532 n.13; *see also* 15 U.S.C. § 78s(h) (giving the SEC the power to "revoke the registration of [a] self-regulatory organization"). When an agency delegates authority

to a private entity by regulation, it may reclaim the power it has delegated by repealing the regulation. In that way, HHS retained ultimate control over the enforcement of federal law.

By contrast, the FTC has no power to change HISA's scheme; its hands are tied. Because Congress itself delegated to the Authority the power to make federal law, the FTC remains impotent to revoke the Authority's regulatory power if it is unhappy with its performance. Unlike HHS, the FTC has only one role in the rulemaking process, which is checking to see whether the Authority's rules fall outside the broad topics set forth in the statute. And for all its activities outside the rulemaking process, one can hardly say the Authority is "closely superintended" by the FTC. For all these reasons, this Court and the district court are in no way bound by *Rettig* and should easily distinguish it.[14]

---

[14] The district court's decision to expand *Rettig*'s application to a new circumstance in which the private entity does *not* function subordinately to the governmental agency was particularly inappropriate in light of concerns judges of this Court and the Supreme Court have expressed about *Rettig* itself. Despite the "small part" that the delegation played in *Rettig*'s statutory scheme, five judges of this Court sought rehearing to determine whether a nondelegation violation had occurred. *Rettig*, 993 F.3d at 415 (5th Cir. 2021) (Ho, J., dissenting). In addition, in an opinion respecting the denial of certiorari in *Rettig*, Justice Alito, joined by Justices Thomas and Gorsuch, expressed the view that HHS's certification rule violated the private nondelegation doctrine because "[w]hat was essentially a legislative determination— the actuarial standards that a State must meet in order to participate in Medicaid—

**2.    This case is not controlled by other cases cited below.**

The district court mistakenly relied on a number of cases, mostly from other circuits, in which courts upheld delegations of power to private entities, but those cases did not involve delegations of legislative power.

This Court should distinguish *Currin v. Wallace*, 306 U.S. 1 (1939), because "[t]he industries in *Currin* did not craft the regulations" like the Authority does in HISA. *Amtrak I*, 721 F.3d at 671. In *Currin* the Supreme Court distinguished *Carter Coal* by stating, "This is not a case where a group of producers may make the law and force it upon a minority." 306 U.S. at 15-16. In *Currin*, "Congress ha[d] merely placed a restriction upon its own regulation by withholding its operation" unless two-thirds of tobacco growers voted in favor of a referendum. *Id.* at 16.

The district court correctly interpreted *Currin* in its first discussion of the case, ROA.1491, but misinterpreted it in its second. ROA.1508, 1516-17. Initially, the district court correctly characterized the holding of

---

was made not by Congress or even by the Executive Branch but by a private group." *Texas v. Comm'r*, 142 S. Ct. at 1309 (Alito, J., respecting the denial of certiorari). However, these Justices "reluctantly concur[red] in the denial of certiorari" because of "threshold questions that could complicate [their] review" of the private nondelegation question.

*Currin*: "Lawmaking is also not entrusted to the industry when Congress conditions an agency's regulatory power on private party approval." ROA.1491. The district court correctly stated that in *Currin*, "the Supreme Court upheld a scheme where a regulation could not take effect in a particular market without the approval of two-thirds of the regulated industry members in that market." *Id.* HISA represents the opposite situation, where a handful of industry elites control the process, as opposed to a majority referendum from the entire industry. And regulations drafted by the private Authority cannot take effect without approval from the FTC. Therefore, the "lawmaking" that is not entrusted to the private industry in *Currin* is not entrusted to the FTC in HISA.

Later in its opinion, the district court incorrectly analogized the "private veto" in *Currin* to the Authority's ability to withhold a rule from the FTC. ROA. 1508. It is true that the Authority can effectively veto FTC regulation, but it is also true that the Authority—and only the Authority—drafts the regulations in the first place. It is this combination of expansive powers far beyond the simple referendum vote in *Currin* that reveals that in HISA "Congress enter[ed] precarious territory when attempting to combine [the two] roles." ROA.1509.

Likewise, other courts have upheld statutes that merely condition governmental action upon a referendum by the regulated industry. *See Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1416 (6th Cir. 1994); *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 759 (9th Cir. 1992); *Frame,* 885 F.2d at 1127-28; *see also United States v. Rock Royal Coop., Inc.*, 307 U.S. 533, 577–78 (1939); *Cook v. Ochsner Found. Hosp.*, 559 F.2d 968, 975 (5th Cir. 1977). The statutes at issue in those cases are a far cry from HISA, in which only the self-selecting insiders in the Authority can make the rules, which are merely conditioned upon a ministerial check by the FTC that they pertain to the subject matters envisioned by the statute. Therefore, this Court should easily distinguish these cases.

In a final nondelegation case in which a statute was upheld, the private entity also was not given the power to draft regulatory rules. *See Pittston*, 368 F.3d at 393. In *Pittston*, the Coal Industry Retiree Health Benefits Act gave a private entity the authority to collect and dispense funds to administer a federal entitlement program. *Id.* at 390. But Congress had "specifie[d] with particularity" who must contribute to the fund and at what amount and who must receive benefits and at what

amount. *Id*. at 396. Therefore, the statute gave the private entity only "administrative tasks" with no legislative powers to craft regulations or make policy decisions. *Id*. at 398. This Court should easily distinguish this narrow administrative role from the lawmaking role of the Authority.

### 3. *Boerschig v. Trans-Pecos Pipeline* does not foreclose a nondelegation claim.

Appellees suggested that this Court does not recognize a claim under Article I, Section 1 because its ruling in *Boerschig v. Trans-Pecos Pipeline*, instead, analyzed the delegation at issue in that case under the Due Process Clause. ROA.339. But *Boerschig* was a garden variety land condemnation case and analyzed state action—not federal. The question was whether the State of Texas could delegate eminent domain power to private utility companies, which then filed condemnation proceedings in state court. 872 F.3d at 703-04, 706. Article I, Section 1 of the U.S. Constitution does not apply to states; it applies only to Congress. Thus, this Court did not analyze the condemnation in *Boerschig* under Article I, Section 1. The Fourteenth Amendment applies to states, and that is why this Court analyzed the delegation in *Boerschig* under the Due Process Clause of the Fourteenth Amendment.

Regarding the federal nondelegation claim at issue in this case, the *Boerschig* court explained, "We need not address the vitality of that nondelegation doctrine as it is rooted in federal separation-of-powers concerns that cannot dictate how state governments allocate their powers." 872 F.3d at 707. Thus, nothing in *Boerschig* precludes the claim in this case. Indeed, *Boerschig* explicitly suggests the appropriate framework for federal claims is separation of powers, not due process.

The district court agreed that *Boerschig* "does not provide a perfect fit for federal delegations." ROA.1494. As the court correctly concluded at its hearing in this case, the facts of *Boerschig* are materially different from the facts of this case: "*Boerschig* . . . involved a state law allowing a company to condemn land. Doesn't that make it materially different from what we have here? I mean, the condemnation power versus basically a law enforcement power. The latter is punitive, and the former is not. . . . *Boerschig* didn't concern legislative power." ROA.1784:16-24.

## II.   HISA violates the Due Process Clause because it gives economically self-interested actors the power to regulate their competitors.

The constitutional analysis of a delegation to a private entity is the same whether it arises from Article I, Section 1 or the Due Process

Clause: "[N]either court nor scholar has suggested a change in the label would effect a change in the inquiry." *Amtrak I*, 721 F.3d at 671 n.3. The Authority did not object to the notion that these two claims are "coterminous," ROA.856, and the district court said that this Court had suggested they were coterminous in *Boerschig*. ROA.1520. While the constitutional violation at issue in this case is best understood as a problem of delegation, it likewise presents a violation of the Due Process clause as well, for all the same reasons given in Part I *supra*.

However, courts addressing private delegations under the Due Process Clause have often relied on a fact that also exists here: that the private entity is run by competitors to the regulated class. As the Supreme Court said in *Carter Coal*, unlawful delegation to a private entity is even more harmful than that to a public entity because "one person may not be entrusted with the power to regulate the business of another, and especially of a competitor." 298 U.S. at 311; *see also Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 118-19 (1928); *Eubank v. City of Richmond*, 226 U.S. 137, 140-41 (1912) (both cases using the Due Process Clause to enjoin statutes that gave some private persons veto power over other private persons' construction

projects). Finally, in *Amtrak III* the D.C. Circuit found a Due Process violation because Congress had given Amtrak, an "economically self-interested actor[, the power] to regulate its competitors," *Ass'n of Am. R.Rs. v. Dep't of Transp..*, 821 F.3d 19, 23 (D.C. Cir. 2016) (*Amtrak III*).

HISA empowers an elite club of economically self-interested actors to run the show, a situation that constituted a red flag in the Supreme Court's previous cases. Four Authority board members are chosen directly from the horseracing industry. 15 U.S.C. § 3052(b)(1)(B). The industry directors include the former president of the Maryland Jockey Club, which owned Pimlico Race Course, home to the Preakness Stakes; the former President of the Breeder's Cup and current Jockey Club member; another current Jockey Club member and the former President of the prominent Kentucky race course and auction house Keeneland; and a veterinarian professor specializing in the treatment of equine injuries. ROA.783, 939. Because the other five board members can have no current ties to horse racing, the self-interested board members will wield considerable influence and likely seek to guide the other members' votes. But they won't have to: the five so-called "independent" directors on the Authority board include a former board member of Churchill

Downs Racetrack and a former president of the New York Racing Association. ROA.783. These two hardly qualify as independent from the industry and represent a violation of the spirit, if not the letter, of the law. Therefore, a majority of the Authority board consists of the elite of the racing world, who have spent their careers overseeing its most prestigious events.

Further, HISA creates two standing committees to advise and guide the Board in drafting its regulations: one on anti-doping and medication control and one on racetrack safety. 15 U.S.C. § 3052(c). A minority of these members also are members of the horseracing industry, economically self-interested actors, and likely persuasive over their non-industry peers. *Id*.

The district court puts great weight in the fact that a majority of board members are so-called "independent" directors. ROA.1522. But *Carter Coal*, *Roberge*, and *Eubank* make no such distinction based on the number of interested parties within the private entity. Three Jockey Club board members and three associated with racetracks are enough. *See N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 526 (2015) (Alito, J., dissenting) ("Suppose that active market participants constitute a

voting bloc that is generally able to get its way? How about an obstructionist minority or an agency chair empowered to set the agenda or veto regulations?").

The Jockey Club and elite racetracks supported passage of HISA, *see* statement of Rep. Pallone *supra* at 15-16, so they could use the power of the federal government to elevate their interests within the industry over those of the tens of thousands of horsemen who opposed its passage. ROA.330. They used a shadowy, multi-layered process in which a paralegal at the law firm now defending them appointed temporary directors, who appointed a nominating committee, who then appointed permanent directors. ROA.479-80. Now, with the imprimatur of Congress, this elite group will make the rules for the thousands of horsemen who eke out a living in the industry.

Also, they convinced Congress to give them the power to charge potentially exorbitant fees that the Horsemen believe are intended to drive many of them out of the industry by artificially increasing the costs of participation. 15 U.S.C. § 3052(f)(3)(C)(ii); ROA.267. The Authority board even holds the ultimate power over any competitor: the power to ban a horseman from racing. 15 U.S.C. § 3057(d)(3)(A).

Therefore, HISA is even more anti-democratic than the statute enjoined in *Carter Coal*. In *Carter Coal*, a two-thirds majority of the industry was given the power to regulate the wages and hours of a minority, but HISA gives a small *minority* of the industry the power to regulate the *majority* of the industry in countless ways. ROA.461. This Court should rely on *Carter Coal* to enjoin HISA for delegating regulatory authority of an industry to a private entity containing competitors, thus violating the Due Process Clause of the Fifth Amendment.

## CONCLUSION

HISA's delegation of governmental power to a private entity is unprecedented. Such a novel arrangement may be convenient for the insiders who want to control the industry, but "[c]onvenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *INS v. Chadha*, 462 U.S. 919, 944 (1983). HISA represents "legislative delegation in its most obnoxious form." *Carter Coal*, 298 U.S. at 311.

The Horsemen respectfully request that this Court vacate the opinion and judgment of the district court, declare HISA in violation of

the private nondelegation doctrine or Due Process Clause, and enter an

injunction against Appellees from enforcing it.


Respectfully submitted,               June 28, 2022

s/ Daniel Robert Suhr
Daniel Robert Suhr*                   Fernando M. Bustos
Reilly Stephens                       Bustos Law Firm, P.C.
Jeffrey D. Jennings                   1001 Main Street, Suite 501
Liberty Justice Center                Lubbock, Texas 79408
440 North Wells Street, Suite 200     Telephone (806) 780-3976
Chicago, Illinois 60654               fbustos@bustoslawfirm.com
Telephone (312) 637-2280
dsuhr@libertyjusticecenter.org        *Counsel of Record*
rstephens@libertyjusticecenter.org
jjennings@libertyjusticecenter.org    *Attorneys for Appellants*

## CERTIFICATE OF SERVICE

I certify that on June 28, 2022, I caused a copy of the foregoing document to be served on all registered counsel of record via the Court's ECF filing system.

s/ Daniel Robert Suhr
Attorney of record for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, according to the Word Count function, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 11,472 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in Word in a proportionally spaced typeface, using Century Schoolbook 14-point font.

s/ Daniel Robert Suhr
Attorney of record for Plaintiffs-Appellants

June 28, 2022