# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 18, 2022

Lyle W. Cayce
Clerk

No. 22-10387

NATIONAL HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; ARIZONA HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; ARKANSAS HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; INDIANA
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
ILLINOIS HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; LOUISIANA HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; MOUNTAINEER PARK HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; NEBRASKA
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
OKLAHOMA HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION; OREGON HORSEMEN'S BENEVOLENT AND
PROTECTIVE ASSOCIATION; PENNSYLVANIA HORSEMEN'S
BENEVOLENT AND PROTECTIVE ASSOCIATION; WASHINGTON
HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION;
TAMPA BAY HORSEMEN'S BENEVOLENT AND PROTECTIVE
ASSOCIATION,

*Plaintiffs—Appellants*,

STATE OF TEXAS; TEXAS RACING COMMISSION,

*Intervenor Plaintiffs—Appellants*,

*versus*

JERRY BLACK; KATRINA ADAMS; LEONARD COLEMAN; MD
NANCY COX; JOSEPH DUNFORD; FRANK KEATING; KENNETH
SCHANZER; HORSERACING INTEGRITY AND SAFETY
AUTHORITY, INCORPORATED; FEDERAL TRADE COMMISSION;

COMMISSIONER KELLY SLAUGHTER; COMMISSIONER ROHIT CHOPRA; COMMISSIONER NOAH PHILLIPS; COMMISSIONER CHRISTINE WILSON,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:21-CV-71

---

Before KING, DUNCAN, and ENGELHARDT, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

We consider challenges to the Horseracing Integrity and Safety Act ("HISA" or the "Act").[1] Enacted in 2020, HISA is a federal law that nationalizes governance of the thoroughbred horseracing industry. To formulate detailed rules on an array of topics, HISA empowers a private entity called the Horseracing Integrity and Safety Authority (the "Authority"), which operates under Federal Trade Commission oversight. Soon after passage, HISA was challenged by various horsemen's associations, who were later joined by Texas and the state's racing commission. The plaintiffs argued HISA is facially unconstitutional because it delegates government power to a private entity without sufficient agency supervision. The district court acknowledged that the plaintiffs' "concerns are legitimate," that HISA has "unique features," and that its structure "pushes the boundaries of public-private collaboration." Nonetheless, the court rejected the private non-delegation challenge, concluding HISA "stays

---

[1] Pub. L. No. 116–260, §§ 1201–12, 134 Stat. 1182, 3252–75 (2020) (codified at 15 U.S.C. § 3051–60).

No. 22-10387

within current constitutional limitations as defined by the Supreme Court and the Fifth Circuit."

We cannot agree. While we admire the district court's meticulous opinion, we conclude that HISA is facially unconstitutional. A cardinal constitutional principle is that federal power can be wielded only by the federal government. Private entities may do so only if they are subordinate to an agency. *See generally A.L.A. Schechter Poultry Corp. v. United States* [*Schechter Poultry*], 295 U.S. 495, 537 (1935); *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939); *Sunshine Anthracite Coal Co. v. Adkins* [*Adkins*], 310 U.S. 381, 399 (1940). But the Authority is not subordinate to the FTC. The reverse is true. The Authority, rather than the FTC, has been given final say over HISA's programs.

While acknowledging the Authority's "sweeping" power, the district court thought it was balanced by the FTC's "equally" sweeping oversight. Not so. HISA restricts FTC review of the Authority's proposed rules. If those rules are "consistent" with HISA's broad principles, the FTC *must* approve them. And even if it finds inconsistency, the FTC can only suggest changes. What's more, the FTC concedes it cannot review the Authority's policy choices. When the public has disagreed with those policies, the FTC has disclaimed any review and instead told the public to "engag[e] with the Authority."[2] An agency does not have meaningful oversight if it does not write the rules, cannot change them, and cannot second-guess their substance. As the district court correctly put it: "Only an Act of Congress could permanently amend any Authority rule or divest it of its powers. The FTC may never command the Authority to change its rules or divest it of its

---

[2] *See Order Approving the Assessment Methodology Rule Proposed by the Horseracing Integrity and Safety Authority* 20, Federal Trade Comm'n (Apr. 1, 2022).

powers." *Horsemen's Benevolent & Protective Ass'n v. Black* [*Black*], No. 5:21-CV-071, 2022 WL 982464, at *69 (N.D. Tex. Mar. 31, 2022). The end result is that Congress has given a private entity the last word over what rules govern our nation's thoroughbred horseracing industry.

The Constitution forbids that. For good reason, the Constitution vests federal power only in the three branches of the federal government. Congress defies this basic safeguard by vesting government power in a private entity not accountable to the people. That is what it has done in HISA. The Authority's power outstrips any private delegation the Supreme Court or our court has allowed. We must therefore declare HISA facially unconstitutional. In doing so, we do not question Congress's judgment about problems in the horseracing industry. That political call falls outside our lane. Nor do we forget that "[t]he judicial power to declare a law unconstitutional should never be lightly invoked." *Sveen v. Melin*, 138 S. Ct. 1815, 1831 (2018) (Gorsuch, J., dissenting). We only apply, as our duty demands, the settled constitutional principle that forbids private entities from exercising unchecked government power.

The district court's judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

## I. Background

### A. Facts

American horseracing is older than the founding. "Despite the disapproval of the Puritan hierarchy, by the mid 1600s, horse racing had become a popular and largely unregulated recreation throughout the colonies." Joan S. Howland, *Let's Not "Spit The Bit" In Defense Of "The Law Of The Horse": The Historical and Legal Development of American*

No. 22-10387

*Thoroughbred Racing*, 14 Marq. Sports L. Rev. 473, 483 (2004).[3] For nearly all our subsequent history, horseracing has been regulated by the States, local communities, and private organizations. *See id.* at 491–92.[4] That changed in 2020. Alarmed by a spate of doping scandals and racetrack fatalities, Congress enacted HISA. *See* 15 U.S.C. § 3051–60.[5] It passed with wide bipartisan support on December 21, 2020, and was signed by President Trump six days later.

1. ***HISA Framework.*** HISA creates a framework for enacting nationwide rules governing racetrack safety, anti-doping, and medication control. *See* § 3054(a). The Act's reach is broad. It applies to all "covered" horses, persons, and horseraces. *See* §§ 3055(a)(1), 3056(a)(1), 3057(a)(1). "Covered horses" means "any Thoroughbred," but other breeds may be brought under the Act's purview by a State racing commission or breed governing organization. § 3051(4); *see also* § 3045(*l*). "Covered horseraces" are those with "a substantial relation to interstate commerce." § 3051(5). "Covered persons" includes "all trainers, owners, breeders, jockeys, racetracks, [and] veterinarians"; licensees of State racing commissions and their "agents, assigns, and employees"; and "other horse support personnel who are engaged in the care, training, or racing of covered horses." § 3051(6).

2. ***The Authority.*** To "develop[] and implement[]" the rules it envisions, HISA empowers a "private, independent, self-regulatory,

---

[3] *See generally* Joan S. Howland & Michael J. Hannon, A Legal Research Guide to American Thoroughbred Racing Law for Scholars, Practitioners, and Participants 112 (1998); Roger Longrigg, The History of Horse Racing 10 (1972).

[4] *See also* Lauren Stelly, *Uniform Drug Reform in Horseracing*, 6 Miss. Sports L. Rev. 71, 73 (2016) (noting that states "realize that more trainers will want to run their horses in the more lenient states").

[5] Unless otherwise noted, all statutory references are to HISA.

nonprofit corporation, to be known as the 'Horseracing Integrity and Safety Authority[.]'" § 3052(a). The Authority's board of directors is set at nine members—five of whom "shall be independent members selected from outside the equine industry." § 3052(b)(1). Choosing board members is left up to a nominating committee. § 3052(d). The Act contains provisions to protect the board from conflicts of interest.[6] The Authority is placed under the "oversight" of the Federal Trade Commission (the "FTC"). *See* § 3053.

*3. Rule Enactment, Approval, and Preemption.* HISA divides responsibility for enacting rules between the Authority and the FTC. The Authority formulates proposed rules. The Act provides that the Authority "shall establish . . . program[s]" in the three key areas of anti-doping, medication control, and racetrack safety. *See* §§ 3055(a)(1), 3056(a)(1). Additionally, the Authority "shall issue . . . a description of safety, performance, anti-doping, and medication control rule violations[.]" § 3057(a)(1). The Act outlines various "considerations," "activities," or "elements" the Authority must incorporate into the programs and rule violations. *See* §§ 3055(b)–(g), 3056(b)–(c), 3057(a)(2)–(e).

The Authority submits proposed rules to the FTC, § 3053(a), which publishes them in the Federal Register for public comment, § 3053(b)(1). A proposed rule "shall not take effect" unless the FTC approves it, § 3053(b)(2), which must occur no later than 60 days after publication, § 3053(c)(1). The FTC "shall approve" a proposed rule if it finds the rule

---

[6] For example, no board member or independent committee member may (1) have a "financial interest in, or provide[] goods or services to, covered horses"; (2) be "[a]n official or officer . . . of an equine industry representative" or serve in a "governance or policymaking capacity for an equine industry representative"; (3) be "[a]n employee of, or an individual who has a business or commercial relationship with" people who have financial interests in covered horses or equine industry officers; or (4) be "[a]n immediate family member of" an individual described in (1) or (2). § 3052(e)(1–4).

"consistent" with the Act and with "applicable rules approved by the [FTC]." § 3053(c)(2). Conversely, the FTC can "make recommendations" to the Authority to modify proposed rules, and the Authority "may resubmit" proposed rules incorporating those modifications. § 3053(c)(3). The FTC itself may adopt an "interim final rule" under the APA's good cause standard, provided it finds this "necessary to protect—(1) the health and safety of covered horses; or (2) the integrity of covered horseraces and wagering on those horseraces." § 3053(e); *see also* 5 U.S.C. § 553(b)(B).

Rules promulgated by the Authority in accordance with HISA "shall preempt any provision of State law or regulation with respect to matters within the jurisdiction of the Authority[.]" § 3054(b).[7]

*4. Enforcement.* The Authority can investigate violations (including by issuing subpoenas) and enforce the rules by imposing civil sanctions or by suing to enforce sanctions or obtain injunctive relief. §§ 3058(a), 3057(j), 3054(h–j). Any civil sanction is subject to *de novo* review by both an administrative law judge and the FTC. § 3058(b)(1), (c)(3)(B). Additionally, the Authority must seek an agreement with the United States Anti-Doping Agency (or comparable entity) to act as the enforcement agency for anti-doping and medication control rules. § 3054(e)(1). It may enter into similar agreements with State racing commissions. § 3054(e)(2). The Authority may also issue guidance on how it interprets or enforces the rules, which must be submitted to the FTC but which "shall take effect" upon submission. § 3054(g)(1–3). Finally, as a condition of participating in covered races,

---

[7] The rules, however, do not preempt state or federal laws "relating to criminal conduct, cruelty to animals, matters unrelated to antidoping, medication control and racetrack and racing safety of covered horses and covered races, and the use of medication in human participants in covered races." § 3054(k)(3).

covered persons must register with the Authority, agree to comply with the rules, and cooperate with enforcement measures. § 3054(d).

**5. *Funding.*** After an initial stage funded by loans obtained by the Authority, the Authority is primarily funded by fees collected from covered persons or State racing commissions. § 3052(f)(1–4). As with other proposed rules, the Authority must submit for the FTC's approval its "formula or methodology for determining [fee] assessments." § 3053(a)(11).

**6. *Approved Rules.*** To date, the FTC has approved the Authority's proposed fee assessment methodology, in addition to three sets of rules concerning racetrack safety, enforcement procedures, and registration requirements and procedures.[8] These rules cover numerous topics and they are minutely detailed. For example, the rules regulate necropsies on horses that die at racetracks; specify continuing education requirements for thirteen categories of persons including trainers, owners, grooms, jockeys, and starters; set out comprehensive regulations for veterinarians; regulate the "traction devices" (such as "toe grabs") on horseshoes; regulate jockeys' health, safety, and equipment; and specify the composition, weight, length, and diameter of riding crops, as well as the maximum number of times a jockey may use a crop to "activate and focus" a horse during a race ("6 times

---

[8] *See* HISA Assessment Methodology Rule, 87 Fed. Reg. 9349 (Feb. 18, 2022); HISA Racetrack Safety, 87 Fed. Reg. 435 (Jan. 5, 2022); HISA Enforcement Rule, 87 Fed. Reg. 4023 (Jan. 26, 2022); HISA Registration Rule, 87 Fed. Reg. 29862 (May 17, 2022).

No. 22-10387

. . . in increments of 2 or fewer strikes").[9] The rules also create a detailed scheme of sanctions.[10]

## B. Procedural History

In March 2021, the National Horsemen's Benevolent and Protective Association and twelve affiliates (collectively, "Horsemen") sued the FTC and the Authority (collectively, "Appellees") in federal district court. The Horsemen claimed HISA was facially unconstitutional on various grounds, including the private non-delegation doctrine and the Fifth Amendment's Due Process Clause.[11] Appellees moved to dismiss, while the Horsemen moved for summary judgment on their private non-delegation and due process claims. After briefing was completed, the State of Texas and the Texas Racing Commission (collectively, "Texas") intervened and joined the Horsemen's summary judgment motion. Texas's complaint added an anti-commandeering claim. The district court ruled it would not consider that claim until it had resolved the outstanding motions.

On March 31, 2022, the district court denied the Horsemen's summary judgment motion and granted Appellees' motion to dismiss. *Black*, 2022 WL 982464. We discuss the district court's reasoning below. A few days after the ruling, the court ordered the parties to confer and file a joint status report regarding Texas's remaining anti-commandeering claim. On

---

[9] *See* HISA Racetrack Safety, 87 Fed. Reg. at 453 (§ 2170) (necropsies); *id.* at 453 (§ 2182) (continuing education); *id.* at 454–57 (§§ 2220–72) (veterinarians); *id.* at 457 (§ 2276) (horseshoes); *id.* at 457 (§§ 2280–82) (riding crops); *id.* at 458 (§§ 2290–93) (jockeys).

[10] *See* HISA Enforcement Rule Modification, 87 Fed. Reg. at 4025.

[11] The Horsemen also claimed HISA was unconstitutional under the public non-delegation doctrine and the Appointments Clause. The district court did not rule on those claims and so they are not before us.

No. 22-10387

April 14, 2022, Texas filed a notice dismissing that claim under Federal Rule of Civil Procedure 41(a), leading to the court's entry of a final judgment on April 19, 2022. The Horsemen and Texas each filed notices of appeal on April 19 and 20, 2022, respectively.

In the district court, Appellants subsequently filed an emergency motion under Federal Rule of Civil Procedure 59(e) to amend the final judgment, realizing that the district court had improperly dismissed the case based on Texas's Rule 41(a) dismissal. On April 25, 2022, the district court denied the Rule 59(e) motion, ruling instead that the previous final judgment was a "nullity" and certifying the court's March 31 order as a final judgment under Rule 54(b). As the district court explained, it did so to remove any doubt as to our court's jurisdiction over the pending appeal. The district court then entered a new final judgment on April 25, 2022.

## C. District Court Ruling

The district court upheld HISA in a thorough opinion which we only summarize here. The court first concluded the Horsemen had standing to bring their private non-delegation and due process claims. *Black*, 2022 WL 982464 at *4–8. The Horsemen faced a concrete, "certainly impending injury," because HISA requires passage of regulations that will aggrieve the Horsemen. *Id.* at *7. That injury is fairly traceable to HISA and would be redressed by a decision finding HISA unconstitutional, because the Horsemen "would no longer be subject to certainly impending regulatory control . . . and would be able to continue administering the race-day medications to their horses that the Authority's rules would inevitably prohibit." *Id.* at *8. The court also concluded that the claims were ripe. *Id.* at *8–10. It reasoned that the case "requires the [c]ourt to resolve a dispute over Congress's choice to create a hybrid rulemaking scheme and the words it used to do so." *Id.* at *10.

No. 22-10387

Turning to the merits, the district court first considered the claim that HISA unconstitutionally delegates government power to a private entity. Synthesizing precedent from the Supreme Court and our circuit, the court framed the pertinent inquiry as (1) whether HISA contains an "intelligible principle guiding the Authority and the FTC"; and (2) whether the Authority "function[s] subordinately to the FTC." *Id.* at 13. On the first question, the court concluded that HISA laid down sufficiently intelligible principles to guide the Authority and the FTC. *Id.* at *14–16.

The second question—whether the Authority is subordinate to the FTC—was more difficult. The court candidly "recognize[d] that HISA's regulatory model pushes the boundaries of public-private collaboration." *Id.* at *27. Nonetheless, the court found no violation of the private non-delegation doctrine, at least "within current constitutional limitations as defined by the Supreme Court and the Fifth Circuit." *Ibid.* Principally, the court reasoned that while the Authority drafts and proposes rules, those rules become law only after "the FTC's independent review and approval." *Id.* at *17. In this regard, HISA draws on the securities-regulation framework, which uses private organizations (like FINRA and its predecessor, the NASD)[12] to govern industry members under SEC oversight. *Ibid.* "[T]he SEC-FINRA model, which inspired the FTC-Authority relationship," the court pointed out, has been "uniformly" upheld against private non-delegation challenges. *Ibid.* (citing *Sorrell v. SEC*, 679 F.2d 1323, 1325–26 (9th Cir. 1982); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977); *R. H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952)). And while our

---

[12] FINRA stands for the "Financial Industry Regulatory Authority." *See, e.g.*, *Saad v. S.E.C.*, 873 F.3d 297, 299 (D.C. Cir. 2017). NASD stood for the "National Association of Securities Dealers." *See, e.g.*, *Nat'l Ass'n of Securities Dealers, Inc. v. S.E.C.*, 431 F.3d 803, 804 (D.C. Cir. 2005).

circuit has not addressed any such challenges, we recently upheld an agency's subdelegating to a private body the authority to certify state medicaid-reimbursement rates. *Id.* at \*17–18 (discussing *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021)). There was no private non-delegation problem, we found, because the agency "independently" reviewed the private entity's activities. *Rettig*, 987 F.3d at 532 (citation omitted). So too here, thought the district court: while the Authority's rule-drafting authority "appears sweeping," the FTC's "review is equally so." *Black*, 2022 WL 982464 at \*18.

All the same, the district court acknowledged that the challengers raised "compelling arguments" against HISA's "novel regulatory scheme" and its delegation to the Authority. *Id.* at \*1, \*10, \*19. For instance, the court noted that the FTC's "limited ability to draft rules" was an "uncommon feature in public-private partnerships." *Id.* at \*19. And while the FTC itself could adopt interim final rules under a "good cause" standard, the narrowness of that emergency power made it "not much of an answer to the Horsemen's concerns." *Ibid.* Still, the court found the restrictions on the agency did not render it subordinate to the Authority under existing precedent. *Id.* at \*19–21 (relying principally on *Currin v. Wallace*, 306 U.S. 1 (1939) and *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* [*Amtrak IV*], 896 F.3d 539 (D.C. Cir. 2018)).

The court also acknowledged that the FTC can review the Authority's proposed rules only for "consistency" with HISA and existing rules, thus giving the Authority unreviewable power to "fill up the details" of regulation and relegating the FTC to an "adjudicative, rather than a regulatory, function." *Id.* at \*22 (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2136 (2019) (Gorsuch, J., dissenting)). Still, the court noted that the Act sought to cabin "consistency" review by incorporating various "elements, considerations, baseline rules, and express prohibitions." *Ibid.* And the court

No. 22-10387

pointed out that the SEC also reviews FINRA rules only for consistency with the enabling statute. *Ibid.* (citing 15 U.S.C. § 78s(b)(2)(C)(i)).

Finally, the court conceded that, unlike the agencies examined in any other private non-delegation case, the FTC lacked any power "to formally modify the Authority's rules." *Id.* at *23. But this was "not fatal" to the Act's constitutionality, because relevant precedents did not turn on the agency's power to modify the private entity's rules, only on its power to "approve or disapprove" them. *Ibid.* (discussing *Adkins*, 310 U.S. 381; *Rettig*, 987 F.3d at 532; *Todd & Co.*, 557 F.2d at 1012). Nonetheless, the court conceded that "the Horsemen's grievance is understandable" and highlighted the following:

> Unlike the SEC-FINRA relationship, the FTC needs the Authority to function as a typical regulator. Only an Act of Congress could permanently amend any Authority rule or divest it of its powers. The FTC may never command the Authority to change its rules or abolish its role in the administrative process.

*Ibid.* (citations omitted). Yet the court again found no private non-delegation problem, based on what it deemed controlling precedents from the Supreme Court and our court. *Id.* at *23–24 (discussing *Currin*, 306 U.S. at 16; *Rettig*, 987 F.3d at 532; *Boerschig v. Trans-Pecos Pipeline, LLC*, 872 F.3d 701, 708–09 (5th Cir. 2017)). Given that "the FTC controls the promulgation of binding rules," there was no private non-delegation problem. *Id.* at *24.

The district court then turned to the due process challenges. The court dismissed those claims, concluding that the Authority is not a self-interested industry competitor because: the Act requires a majority independent board and standing committees; includes a conflicts-of-interest section that precludes those with financial and familial relations from serving on the board; and enrolls impartial hearing officials or tribunals to conduct

No. 22-10387

adjudications for rule violations, which are approved by the FTC. *Id.* at *25–26.[13]

In sum, the district court concluded that (1) the Horsemen had standing; (2) their claims were ripe; (3) and HISA did not violate the private non-delegation doctrine or the Due Process Clause.

## II. Standard of Review

"We review de novo a district court's rulings on a motion to dismiss and a motion for summary judgment, applying the same standard as the district court." *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325, 332 (5th Cir. 2017).

Appellants facially challenge HISA's constitutionality. To sustain such a challenge, they must show "that no set of circumstances exists under which the [statute] would be valid." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." *Id.* at 752–53 (citations omitted).

## III. Appellate Jurisdiction

We must first address our appellate jurisdiction. *See Chandler v. Phoenix Servs., L.L.C.*, 45 F.4th 807, 812 (5th Cir. 2022). The Authority[14] argues we lack jurisdiction because the Horsemen did not file a timely notice of appeal from a valid final judgment and because Texas lacks appellate standing. We reject the first argument and so need not reach the second.

---

[13] The Authority's ability to charge fees also did not disturb the district court because the Authority is not obligated to operate as a for-profit corporation. *Id.* at *26.

[14] The FTC does not contest our jurisdiction.

14

No. 22-10387

The district court entered final judgment on April 19, 2022. That same day, the Horsemen filed a notice of appeal seeking review of the March 31, 2022 order dismissing all of their claims with prejudice. The April 19 final judgment was invalid, however, because it also purported to dismiss without prejudice Texas's anti-commandeering claim under Rule 41(a). Our precedent does not allow that.[15] As a result, the Horsemen's notice of appeal was premature. *See* Fed. R. App. P. 4(a)(2) (referring to a notice of appeal "filed after the court announces a decision or order . . . but before the entry of the judgment or order").[16]

But the district court subsequently cured any problem with the premature notice. On April 25, 2022, the court certified its March 31, 2022 order as final and appealable under Federal Rule of Civil Procedure 54(b).[17] That Rule 54(b) certification made the Horsemen's original notice effective to appeal the March 31, 2022 order. "Under [Federal Rule of Appellate Procedure] 4(a)(2), an appeal from a nonfinal decision may serve as an effective notice of appeal from a subsequently entered final judgment if the nonfinal decision '*would be* appealable if immediately followed by the entry of judgment.'" *Cousin v. Small*, 325 F.3d 627, 631 (5th Cir. 2003) (quoting

---

[15] *See Exxon Corp. v. Maryland Cas. Co.*, 599 F.2d 659, 662–63 (5th Cir. 1979) (explaining Rule 41(a) does not allow dismissal of individual claims); *see also Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 345 (5th Cir. 2020) (en banc) (citing *Exxon Corp.* for this proposition).

[16] *See also, e.g., Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 539 n.1 (5th Cir. 2005) (notice of appeal was "premature" because filed "before the district court entered a final decision"); *Young v. Equifax Credit Info. Serv's, Inc.*, 294 F.3d 631, 634 n.2 (5th Cir. 2002) (a notice of appeal was "technically premature" because district court's order was not a valid final judgment).

[17] *See* Fed. R. Civ. P. 54(b) (providing "the [district] court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties, only if the court expressly determines that there is no just reason for delay"). Here, the district court's Rule 54(b) order expressly determined that no just reason for delay existed.

No. 22-10387

*FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269, 276 (1991)). Our court "has applied [this] rule in the context of the entry of a rule 54(b) certification after a prematurely filed notice of appeal, precisely the situation presented by this case." *Ibid.* (citing *Barrett v. Atl. Richfield Co.*, 95 F.3d 375 (5th Cir. 1996)). The Horsemen's notice of appeal, then, is deemed filed on the date of and after entry of the Rule 54(b) judgment. Fed. R. App. P. 4(a)(2). It was therefore timely and effective to bring the March 31, 2022 order before us.

Appellees nevertheless contend that Appellants' joint Rule 59(e) motion—filed on April 22, 2022—made the previously filed notices of appeal "nullities," thus requiring the Horsemen to file a new or amended notice. Appellees cite no authority for that proposition. Rather, they cite cases holding that a notice of appeal is ineffective if filed while a Rule 59(e) motion remains pending before the district court.[18] Those cases, however, do not mean that a Rule 59(e) motion somehow "nullifies" a previously filed notice of appeal. Here, the district court denied the Rule 59(e) motions in the same order that it certified its March 31, 2022 order under Rule 54(b). As discussed, that Rule 54(b) certification had the effect of perfecting the

---

[18] *See, e.g.*, *Lawson v. Stephens*, 900 F.3d 715, 717–20 & n.3 (5th Cir. 2018) (explaining notice of appeal was "ineffective" because district court had never ruled on pending Rule 59(e) motion); *see also* Fed. R. App. P. 4(a)(4)(B)(i) (a notice of appeal filed before court disposes of various motions, including a Rule 59(e) motion, "becomes effective" only upon court's disposing of the pending motion); *Banister v. Davis*, 140 S. Ct. 1698, 1703 (2020) (explaining that, whereas a timely Rule 59(e) motion means "there is no longer a final judgment to appeal from," the disposition of that motion "restores the finality of the original judgment, thus starting the 30-day appeal clock" (cleaned up)); *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989) (explaining "Federal Rule of Appellate Procedure 4(a)(4) renders ineffective any notice of appeal filed while a Rule 59(e) motion is pending").

No. 22-10387

premature notice of appeal. Fed. R. App. P. 4(a)(2); *Cousin*, 325 F.3d at 621; *Barrett*, 95 F.3d at 379.

The Horsemen's notice of appeal was therefore timely and effective to appeal the district court's March 31, 2022 order. No one disputes the district court's conclusion that the Horsemen have standing. We therefore need not consider whether Texas does also. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

We proceed to the merits.

## IV. Private Non-Delegation Doctrine

Our Constitution permits only the federal government to exercise federal power. This is why each of the first three articles begins by "vest[ing]" legislative, executive, and judicial power "in" specific entities: "a Congress," "a President," and a "supreme Court" and other federal "Courts."[19] If it were otherwise—if people outside government could wield the government's power—then the government's promised accountability to the people would be an illusion. *See* The Federalist No. 51 ("A

---

[19] *See* U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); art. II, § 2 ("The executive Power shall be vested in a President of the United States of America."); art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as Congress may from time to time ordain and establish."); *see also Dep't of Transp. v. Ass'n of Am. R.R.s* [*Amtrak II*], 575 U.S. 43, 67 (2015) (Thomas, J., concurring) ("[T]he Constitution identifies three types of governmental power and, in the Vesting Clauses, commits them to three branches of Government. . . . These grants are exclusive."); Steven G. Calabresi, *The Vesting Clauses As Power Grants*, 88 Nw. U.L. Rev. 1377, 1390 (1994) ("[T]he three powers of government described in the Vesting Clauses constitute a finite set of all the governmental powers that our Constitution sanctions.").

dependence on the people is, no doubt, the primary control on the government[.]”); *Amtrak II*, 575 U.S. at 61 (Alito, J., concurring) (“The principle that Congress cannot delegate away its vested powers exists to protect liberty.”). This point is reflected in the Supreme Court’s non-delegation cases. While the Court has allowed limited delegations of authority to government agencies, *see Whitman v. Am. Trucking Ass’ns*, 531 U.S. 457, 472–76 (2001), it has set its face against giving public power to private bodies. “Such a delegation of legislative power,” the Court thundered nearly a century ago, “is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress.” *Schechter Poultry*, 295 U.S. at 537; *see also Amtrak II*, 575 U.S. at 62 (Alito, J., concurring) (“When it comes to private entities, . . . there is not even a fig leaf of constitutional justification” for delegation). Not content merely to reject the idea, the Court has also called it insulting names. *See Carter Coal Co.*, 298 U.S. at 311 (conferring power on private persons is “legislative delegation in its most obnoxious form”).

This commonsense principle has come to be known as the “private non-delegation doctrine.” *See, e.g.*, *Tex. v. Comm’r of Internal Revenue*, 142 S. Ct. 1308 (2022) (statement of Alito, J., respecting the denial of certiorari) (noting “the need to clarify the private non-delegation doctrine”).[20] Key to applying the doctrine are two eighty-year-old Supreme Court cases, *Carter Coal* (1936) and *Adkins* (1940). In *Carter Coal*, the Court invalidated a federal law that authorized a majority of coal producers to fix wages and hours for all producers. 298 U.S. at 311–12. Giving regulatory power to “private persons

---

[20] *See also, e.g.*, Alexander Volokh, *The New Private-Regulation Skepticism: Due Process, Non-Delegation, and Antitrust Challenges*, 37 Harv. J. L. & Pub. Pol’y 931, 970 (2014) (discussing the “private non-delegation doctrine”); Emily Hammond, *Double Deference in Administrative Law*, 116 Colum. L. Rev. 1705, 1721–28 (same).

No. 22-10387

whose interests may be and often are adverse to the interests of others in the same business" was, the Court held, an unconstitutional "legislative delegation" of a "governmental function." *Id.* at 311. Congress then rewrote the law and, four years later, the Court upheld it in *Adkins*. 310 U.S. at 388. Under the new law, private boards only proposed prices—and those prices now had to be "approved, disapproved, or modified by the [agency]." *Ibid.* The private entities "operate[d] as an aid" to the agency "but [were] subject to its pervasive surveillance and authority." *Ibid.* The Court found the new scheme "unquestionably valid." *Id.* at 399. The Court emphasized that the private entities "function[ed] subordinately to the [agency]," that the agency and not the private entities "determine[d] the prices," and that the agency had "authority and surveillance over the [private entities]." *Ibid.*

From these decisions, courts have distilled the principle that a private entity may wield government power only if it "functions subordinately" to an agency with "authority and surveillance" over it.[21] The D.C. Circuit has expressed the idea more precisely: "Congress may formalize the role of private parties in proposing regulations so long as that role is merely 'as an aid' to a government agency that retains the discretion to 'approve[], disapprove[], or modif[y]' them." *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* [*Amtrak I*], 721 F.3d 666, 671 (D.C. Cir. 2013) (quoting *Adkins*, 310 U.S. at

---

[21] *See, e.g.*, *Rettig*, 987 F.3d at 532 ("Agencies may subdelegate to private entities so long as the entities 'function subordinately to' the federal agency and the federal agency 'has authority and surveillance over [their] activities.'" (alternation in original)); *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (delegation to a private entity impermissible unless the entity "function[s] subordinately" to an agency with "'authority and surveillance' over [it]"); *United States v. Frame*, 885 F.3d 1119, 1128 (3d Cir. 1989) (same) (all quoting *Adkins*, 310 U.S. at 399).

No. 22-10387

388), *vacated and remanded on other grounds by Amtrak II*, 575 U.S. 43.[22] If the private entity does not function subordinately to the supervising agency, the delegation of power is unconstitutional.[23]

In this case, the parties agree on these basic parameters, as did the district court. *See Black*, 2022 WL 982464, at *25. But they differ sharply over whether the Authority functions subordinately to the FTC. As noted, the district court found the Authority subordinate because the Authority's proposed rules become law only after the FTC "independently" reviews and approves them. *Id.* at *17. Appellants say the reverse is true: the FTC's arms-

---

[22] The D.C. Circuit's *Amtrak I* decision was vacated and remanded because the Supreme Court found Amtrak was a governmental entity, not the private entity it purported to be. *Amtrak II*, 575 U.S. at 46, 50–55. The Supreme Court thus had no occasion to discuss the circuit court's private non-delegation analysis. *See ibid.*

[23] Courts and commentators differ over the locus of the constitutional violation. Some suggest the Due Process Clause. *See, e.g.*, Alexander Volokh, *The Shadow Debate over Private Nondelegation in DOT v. Association of American Railroads*, 2014–2015 Cato Sup. Ct. Rev. 359, 376 (2015) ("[D]elegation to a private, self-interested party is a due process problem, not a non-delegation problem."); Volokh, *supra* note 11, at 932 ("The Due Process Clause is a potential limit on the private exercise of regulatory power."). Others suggest the Vesting Clauses. *See, e.g.*, *Pittston Co.*, 368 F.3d at 394 ("[W]hen the Constitution vests 'all legislative Powers' in a Congress of the United States, 'the executive Power' in a President of the United States, and 'the judicial Power' in one Supreme Court and such courts as Congress may establish, . . . a non-delegation principle serves both to separate powers as specified in the Constitution, and to retain power in the government Departments so that delegation does not frustrate the constitutional design.") (internal citations omitted); Thomas W. Merrill, *Rethinking Article I, Section 1: From Nondelegation To Exclusive Delegation*, 104 Colum. L. Rev. 2097, 2168 (2004) ("A more plausible source of constraint on delegations to nonfederal actors is the Constitution's implicit design principle limiting the federal government to three branches."). We need not weigh in. Whatever the constitutional derivation, all parties and the district court agree that the outcome turns on whether the private entity is subordinate to the agency. *See Amtrak I*, 721 F.3d at 671 n.3 ("While the distinction [in constitutional provenance] evokes scholarly interest, . . . neither court nor scholar has suggested a change in the label would effect a change in the inquiry.").

No. 22-10387

length oversight makes the agency subordinate to the Authority. We must decide which one, agency or Authority, has the whip hand.[24]

### A. The Authority Has Sweeping Rulemaking Power.

We start where we and the district court firmly agree: the Authority's rulemaking power is "sweeping." *Id.* at *18. HISA itself does not create anti-doping, medication, or racetrack safety programs. Nor does HISA empower the FTC to do so. Instead, as Texas's brief points out, "HISA delegates the task of creating such programs to the Authority." That follows from the Act's plain terms. It is "the Authority"—not the FTC—that "shall establish" the anti-doping, medication, and racetrack safety programs. §§ 3055(a)(1), 3056(a)(1). It is "the Authority"—not the FTC—that "approv[es]" a request (by a state racing commission or breed governing organization) to include breeds other than Thoroughbreds and that "consider[s]" how to adapt its programs to those breeds. §§ 3054(*l*)(1), 3055(a)(2).[25] And it is "the Authority"—not the FTC—that "shall issue"

---

[24] As discussed, the district court thought the private non-delegation analysis includes the question (more familiar in the public non-delegation realm) whether Congress has provided an "intelligible principle" to guide the agency and the private entity. *Black*, 2022 WL 982464, at *11; *see, e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (public non-delegation question is "whether Congress has supplied an intelligible principle to guide the delegee's use of discretion"). The parties do not join argument on whether the intelligible-principle analysis belongs in the private non-delegation context, so we do not address the point. We address only whether the Authority functioned subordinately to the FTC. All agree that this question is determinative, quite apart from whether HISA provides an "intelligible principle" to guide a private delegee. *See Black*, 2022 WL 982464, at *12 ("An intelligible principle . . . cannot rescue a statute empowering private parties to wield regulatory authority" unless "they function subordinately to an agency." (citing *Amtrak I*, 721 F.3d at 671; *Adkins*, 310 U.S. at 399) (cleaned up))).

[25] The Authority's approval of a request to expand HISA's reach to other breeds appears not to be subject to any FTC review whatsoever. *See* § 3054(*l*)(1). Texas argues that this feature of HISA independently violates the private non-delegation doctrine and,

No. 22-10387

descriptions of rule violations, § 3057(a)(1), and "shall establish" sanctions for them, § 3057(d)(1). As the district court correctly found, in HISA, Congress empowered "the Authority" with "sweeping" power to make "myriad" rules for the horseracing industry. *Black*, 2022 WL 982464, at *18.

To be sure, Congress also included various "considerations" and other factors to guide the Authority's development of the rules. But that only underscores the point that it is the Authority, not the agency, that is tasked with weighing polices that go into formulating rules. For instance, HISA broadly instructs the Authority to create a program that includes "[a] uniform set of training and safety standards and protocols consistent with the humane treatment of covered horses," § 3056(b)(2), while leaving the policy details up to the Authority. (And, as we shall see, the FTC has affirmatively disclaimed any authority to second-guess the Authority's policy choices). Keep in mind, moreover, that we are not considering here whether the "considerations" provide a sufficiently intelligible principle to satisfy the *public* non-delegation doctrine. *See Big Time Vapes, Inc. v. F.D.A.*, 963 F.3d 436, 443–444 (5th Cir. 2020) (concluding the Tobacco Control Act provided a sufficiently intelligible principle). Instead, we are deciding whether the Authority is subordinate to the agency. And, on its face, HISA's generous grant of authority to the Authority to craft entire industry "programs" strongly suggests it is the Authority, not the FTC, that is in the saddle.

The district court was candid about this aspect of the FTC-Authority relationship, calling it "unique," "unusual," and "uncommon." *Black*, 2020 WL 982464, at *19, *22. Still, the court insisted this did "not

---

additionally, does not even include an intelligible principle to govern Authority's exercise of power. Appellees respond that Texas waived this argument by not raising it in the district court and, in any event, lacks standing to raise it. Because we conclude that HISA is unconstitutional on other grounds, we need not address this question.

No. 22-10387

necessarily convert the Authority into an insubordinate entity in the rulemaking scheme." *Id.* at \*19. To explain why, the court first pointed to the FTC's power to adopt "interim final rules." *Ibid.* (citing § 3053(e)). But in the same breath the court acknowledged this was "not much of an answer." *Ibid.* We agree. After all, as the court noted, the FTC's interim rulemaking power is subject to the APA good cause standard, which means it is "narrow[]" authority reserved for "emergency situations." *Ibid.* (citation omitted); *see* 5 U.S.C. § 553(b)(B) (good cause standard).[26] That the agency can make temporary rules on a break-glass-in-case-of-an-emergency basis does not suggest the agency is superior to the Authority. It suggests the opposite—that the Authority is in charge.[27]

The district court placed heavier reliance on the Supreme Court's *Currin* decision. In that case, Congress established tobacco regulations that would go into effect only if approved by two-thirds of growers in a particular market. 306 U.S. at 6. This was not a private delegation, the Court held, because it only let the growers "determine exactly when [Congress's] exercise of the legislative power should become effective." *Id.* at 16 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 407 (1928)). The

---

[26] *See also United States v. Johnson*, 632 F.3d 912, 928 (5th Cir. 2011) ("Further, it is well established that the 'good cause' exception to notice-and-comment should be read narrowly in order to avoid providing agencies with an escape clause from the requirements prescribed." (internal quotation marks omitted)); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) ("[T]he 'good cause' exception is to be narrowly construed and only reluctantly countenanced." (internal quotation marks omitted)).

[27] At oral argument, Appellees suggested the FTC's interim rulemaking power mirrors the SEC's ability to "abrogate, add to, and delete from" FINRA rules "as the [SEC] deems necessary or appropriate to insure the fair administration of the self-regulatory organization . . . ." *Id.* § 78s(c); *see also* O.A. Rec. at 24:52–27:30. We disagree. As discussed below, *see infra* Part IV.B.2., the SEC's power to change FINRA rules is not limited to emergency situations or situations meeting the "good cause" standard.

Court emphasized, though, that the power to write the regulations "ha[d] already been exercised legislatively by the body vested with that power under the Constitution." *Ibid.*

The district court thought HISA's restrictions on the FTC's rulemaking power "parallels the private veto allowed in *Currin*." *Black*, 2022 WL 982464, at *19. We disagree. As the Supreme Court explained, the growers' veto "[wa]s not a case where a group of producers may make the law and force it upon a minority." *Currin*, 306 U.S. at 15–16 (citing *Carter Coal*, 298 U.S. at 310, 318). Nonetheless, the district court tried to analogize the growers' veto to "ultimately determin[ing] . . . what the substance of that rule would be." *Black*, 2022 WL 982464, at *19. But this limping analogy was rejected by *Currin*: "While in a sense one may say that [the growers] are exercising legislative power, it is not an exact statement, because the power has already been exercised legislatively by the body vested with that power under the Constitution." 306 U.S. at 16. The bottom line is that *Currin* involved no delegation of authority to make rules, whereas HISA does. The *Currin* growers had only a veto over regulations—important to them, no doubt—but they did not write the regulations. The Authority does.[28]

## B. The FTC Has Limited Power To Review Proposed Rules.

Despite the Authority's "sweeping" rulemaking power, the district court found the Authority was subordinate to the FTC. The court's reasoning proceeded in multiple steps. First, citing *Adkins*, the court reasoned that the "FTC's independent review and approval" meant that "[l]awmaking . . . [was] 'not entrusted to the [Authority].'" *Black*, 2022 WL

---

[28] As explained below, the Authority *also* has a veto every bit as effective as the growers' veto in *Currin. See infra* Part IV.B.4. But the point here is that, in addition to that veto, the Authority writes the rules, which far outstrips the growers' role in *Currin.*

982464, at *17 (quoting *Adkins*, 310 U.S. at 399). Second, the court reasoned that HISA followed the securities industry model of using private self-regulatory organizations under SEC oversight, a model that has "consistently withstood private nondelegation challenges." *Ibid.* Third, the court believed that our rejection of a private non-delegation claim in *Rettig* forecloses the challenge to HISA. *Id.* at *18. Fourth, the court declined to follow the D.C. Circuit's *Amtrak I* decision. *Id.* at *20–21. We address each point in turn.

### 1. The FTC lacks power to review the Authority's policy choices.

We turn first to the FTC's supposedly "independent" review and approval of the Authority's proposed rules. *Id.* at *17. Once the Authority submits proposed rules to the FTC, the agency must do two things. *See* § 3053(a), (c). First, it must publish the proposed rules in the Federal Register for public comment. § 3053(b)(1). Second, it must determine within 60 days whether a proposed rule is "consistent" with HISA and prior rules. § 3053(c)(1)–(2). If so, then the FTC "shall approve" the proposed rule. § 3053(c)(2). The district court principally relied on this "consistency" review to find the Authority operated subordinately to the agency. *Id.* at *22. The court was mistaken. The FTC's oversight is too limited to ensure the Authority "function[s] subordinately" to the agency. *Adkins*, 310 U.S. at 399.

The FTC's limited review of proposed rules falls short of the "pervasive surveillance and authority" an agency must exercise over a private entity. *Adkins*, 310 U.S. at 388. The district court itself could not even define what consistency review entailed. *Black*, 2022 WL 982464, at *22. "At a minimum," the court supposed the FTC would measure rules against the Act's purposes (such as ensuring "the safety, welfare, and integrity of covered horses," etc.), *see* § 3054(a)(2)(A), or against "the elements, considerations, baseline rules, and express prohibitions the Act contains."

*Black*, 2022 WL 982464, at *22. The court likened this to "an adjudicative . . . function akin to courts reviewing agency action for whether it is 'in excess of statutory jurisdiction, authority, or limitations.'" *Ibid.* (quoting 5 U.S.C. § 706(2)(C)).

Even assuming any of those notions can be read into HISA, such arms-length review hardly subjects the Authority's rules to "independent" oversight. What would it mean, for instance, to say a rule is "consistent" with the proposition that medication "should be the minimum necessary to address the diagnosed health concerns identified during the examination and diagnostic process"? *See* § 3055(b)(7). Or the aspiration that a safety program include "[a] uniform set of training and racing safety standards and protocols consistent with the humane treatment of covered horses"? *See* § 3056(b)(2). Even the "baseline" medication principles the district court cited are open-ended: for instance, the Authority must "take into consideration" that horses "should compete only when they are free from the influence of medications, other foreign substances, and methods that affect their performance." § 3056(b)(1). Saying a rule is or is not "consistent" with that standard says next to nothing. Such high-altitude oversight, the district court itself acknowledged, "largely gives the Authority the power to 'fill up the details' of the Act in places with less specific directives," and "[f]illing up the details has long been recognized as the very business of regulating." *Black*, 2022 WL 982464, at *22 (citing *Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting); *United States v. Grimaud*, 220 U.S. 506, 517 (1911)).

In any event, whatever "consistency" review includes, we know one thing it *excludes*: the Authority's policy choices in formulating rules. This blunt fact has been repeatedly confirmed by the FTC itself. For example, when approving the Authority's hearing rules (the "Proposed Rule Series 8300"), the FTC explained it "reviews the Authority's proposals for their

No. 22-10387

consistency with the Act and the [FTC's] rule, *not for general policy*."[29] It thus disregarded "comments [that] offered *policy recommendations* without identifying any inconsistency between the proposed rule provisions and the Act."[30] Similarly, when reviewing a rule on "toe grabs"—basically, cleats for horses—the FTC complained that commenters did not challenge the "rule's consistency with the Act;" instead they "challenge[d] certain details in the Authority's choice of permitted horseshoes, but *these are essentially policy disagreements*."[31] One more example: when addressing complaints about the Authority's fee-assessment methodology, *see* HISA Assessment Methodology Rule, 87 Fed. Reg. 9349 (Feb. 18, 2022), the FTC encouraged commenters to "continue engaging with the Authority":

> While the [FTC] concludes that the interstate methodology proposed by the Authority is consistent with the Act, it is worth noting that there are likely multiple methodologies that the Authority could have proposed that would be consistent with the Act. Accordingly, *the [FTC] encourages states that would prefer another methodology to continue engaging with the Authority*, which in its response committed to keeping an open mind

---

[29] *Order Approving the Enforcement Rule Proposed by the Horseracing Integrity and Safety Authority ("Order Approving Enforcement Rule")*, 26, Federal Trade Comm'n (Mar. 25, 2022) (emphasis added).

[30] *Id.* at 26–27 (emphasis added). As the same order explained elsewhere, the FTC's "statutory mandate to approve or disapprove a proposed Authority rule is limited to considering only whether the proposed rule 'is consistent with' the Act and the Commission's procedural rule." *Id.* at 4 (citing § 3053(c)(2)). "Nevertheless," the order continued, "the [FTC] received many comments that were unrelated to [consistency] . . . and those comments *have little bearing on the [FTC's] determination*." *Ibid.* (emphasis added). While the FTC would not consider them, the order noted "*the Authority* has stated that it will use those comments when it proposes future rule modifications." *Ibid.* (emphasis added).

[31] *Order Approving Enforcement Rule* at 43.

about the interstate methodology of the Assessment Methodology proposed rule . . . .

*Order Approving the Assessment Methodology Rule Proposed by the Horseracing Integrity and Safety Authority* 20, Federal Trade Comm'n (Apr. 1, 2022) (emphasis added). In short, the conclusion is inescapable that the FTC's consistency review does not include reviewing the substance of the rules themselves.[32]

If the FTC cannot review the policy choices behind the rules, then logically the FTC cannot make the Authority modify those policies. That is again confirmed by HISA's plain terms. The modification power the Act gives the FTC is limited in two ways. It pertains only to whether a rule is "consistent" with the Act and does not include review of the policies informing the rule. *See* § 3053(c)(3)(A).[33] And, even then, the FTC can only make "recommendations" to the Authority. *Ibid.* In response, the Authority "may resubmit" a rule incorporating the "recommended" modification. § 3053(c)(3)(B). The Act thereby confirms—in the district court's words—

---

[32] This answers two additional arguments made by the Authority. First, the Authority invokes the constitutional-avoidance canon, but that canon applies only to "ambiguous" text. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). There is nothing ambiguous here: HISA explicitly limits agency review to "consistency." Second, the Authority invokes the distinction between facial and as-applied challenges. But the curtailment of agency review appears on the statute's *face*. *See* § 3053(c). Nor does our using three examples of the agency's limited review convert this to an as-applied analysis. We do not invoke those examples to critique "a defined subset of [HISA's] applications," as one would in an as-applied challenge. *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010). Rather, we invoke them to show that the agency is applying HISA exactly as written—to cabin the agency's review to "consistency" and to exclude it from second-guessing the Authority's policy choices.

[33] That follows from the text and is confirmed by the way the FTC reads the provision. As discussed, in responding to commenters, the agency sharply distinguishes comments as to "inconsistency" with the Act (which the FTC considers) from comments as to "policy recommendations" (which the FTC disregards).

No. 22-10387

the FTC's "inability to formally modify the Authority's rules." *Black*, 2022 WL 982464, at \*23. Not only does HISA speak of a mere "recommendation" to modify, but it says the Authority "may" choose to modify, or not. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress' use of the permissive 'may' . . . contrasts with the legislators' use of a mandatory 'shall' in the very same section."); *cf.* § 3053(d)(2) (the FTC "shall publish" proposed rules in Federal Register). The Act's division of labor is clear: the Authority writes the rules; the agency may suggest certain changes, but the Authority can take them or leave them. Indeed, this was conceded by the district court itself: "The FTC *may never* command the Authority to change its rules or abolish its role in the administrative process." *Black*, 2022 WL 982464, at \*23 (emphasis added).

Despite finding the FTC unable to modify rules, the district court deemed this "not fatal" to HISA. *Ibid.* Again, we disagree. The district court reasoned that "the agency in *Currin* could not modify its regulation without industry approval." *Ibid.* But, as explained, the private growers in *Currin* could only stop regulations from going into effect; they could not rewrite them. Here, the Authority writes the regulations and the FTC cannot modify them. The court also reasoned that *Adkins* "did not rely" on the fact that the agency could modify the prices proposed by private parties. *Ibid.* That is mistaken. In finding no delegation, *Adkins* stated: "The members of the code [*i.e.*, the private entity] function subordinately to the Commission [*i.e.*, the agency]. *It, not the code authorities, determines the prices.*" 310 U.S. at 399 (emphasis added). The opposite is true here. The Authority, not the FTC, determines the rules. The FTC's "consistency" review cannot touch the Authority's policy judgments when it does so.

In sum, we conclude that the FTC's limited review of proposed rules does not make the Authority function subordinately to the agency.

No. 22-10387

## *2. The FTC has less supervisory power than the SEC.*

The district court also relied on sister-circuit cases affirming the constitutionality of the Maloney Act, which created the SEC-FINRA model and after which Congress modeled HISA. *Black*, 2022 WL 982464, at \*17 ("[E]very court to consider a non-delegation challenge to the Maloney Act has concluded that there is 'no merit in the contention that the Act unconstitutionally delegates power to' a private entity." (quoting *Sorrell v. SEC*, 679 F.2d 1323, 1326 (9th Cir. 1982))); *see also, e.g., Todd & Co.*, 557 F.2d at 1012. Like the Authority, FINRA is a private entity empowered to draft and propose regulations to the SEC. *See* 15 U.S.C. § 78s(b)(1) (providing a "self-regulatory organization shall file with the [SEC] ... copies of any proposed rule"). Appellees also press this argument on appeal.

The argument misses a key distinction, however. Unlike HISA, the Maloney Act empowers the SEC to "abrogate, add to, and delete from" FINRA rules "as the [SEC] deems necessary or appropriate[.]" 15 U.S.C. § 78s(c); *see also Aslin v. Fin. Indus. Regul. Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013) (observing that the SEC "may abrogate, add to, and delete from all FINRA rules as it deems necessary") (citation omitted). This rulemaking power meaningfully distinguishes the SEC-FINRA relationship from the FTC-Authority relationship, as the district court acknowledged: "[B]ecause Congress withheld the FTC's ability to modify proposed rules, the Authority wields greater power than FINRA and the private entities in *Adkins*." *Black*, 2022 WL 982464, at \*22. Said another way: although FINRA plays an important role in formulating securities industry rules, its role is ultimately "in aid of" the SEC, which has the final word on the substance of the rules. *See Adkins*, 310 U.S. at 388. Not so here. The Authority not only formulates and proposes horseracing industry rules but, given the limits built into the FTC's oversight, it also has the final word on what those rules are. Again, the district court conceded this: "Unlike[] the SEC-FINRA relationship, the

No. 22-10387

FTC needs the Authority to function as a typical regulator." *Black*, 2022 WL 982464, at *23; *see also In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) ("Absent the unique self-regulatory framework of the securities industry, [FINRA's] responsibilities would be handled by the SEC.").

We therefore cannot agree with the district court and Appellees that the Maloney Act supports the constitutionality of HISA's delegation of rulemaking power to the Authority.[34] For similar reasons, we reject Appellees' argument that the FTC's "revise-and-resubmit power," *i.e.*, the FTC's power to deny a proposal and suggest modification, puts the FTC here on similar footing to the SEC. *See* § 3053(c)(3). As explained, the FTC's power to *recommend* modifications is not equivalent to the power to *require* modifications. The SEC itself can make changes to FINRA rules, *see* 15 U.S.C. § 78s(c), but the FTC can only recommend changes to the Authority's rules (and then, only to the extent that the rules are "inconsistent" with HISA). Because we are considering whether the private entity is subordinate to the agency for rulemaking purposes, that distinction makes all the difference.[35]

---

[34] Moreover, as the district court recognized, our circuit has never addressed a private non-delegation challenge to the Maloney Act. *Black*, 2022 WL 982464, at *17. The district court observed, however, that in *Rettig* we "approvingly cited" *R.H. Johnson*, a Second Circuit decision that first upheld the Maloney Act on non-delegation grounds. *Ibid.*; *see Rettig*, 987 F.3d at 532 n.12 (citing *R.H. Johnson & Co. v. S.E.C.*, 198 F.2d 690, 695 (2d Cir. 1952)). Respectfully, that reads too much into a "see also" footnote citation. Nothing in *Rettig* suggests our court was adopting wholesale our sister circuits' non-delegation analysis of the Maloney Act. And, as discussed *infra* Part IV.B.3., *Rettig* itself is consistent with our decision finding in HISA an impermissible private delegation.

[35] For the same reason, we find irrelevant Appellee's argument that the SEC engages in same "consistency" review as the FTC. *See id.* § 78s(b)(2)(C)(i) ("The Commission shall approve a proposed rule change of a self-regulatory organization if it

No. 22-10387

### *3.* **Texas v. Rettig** *does not foreclose the challenge to HISA.*

The district court also concluded our private non-delegation decision in *Rettig* supported the constitutionality of HISA. *Black*, 2022 WL 982464, at *18. We disagree.

In *Rettig*, we considered a private non-delegation challenge to a Department of Health and Human Services ("HHS") subdelegation rule requiring a private board to certify as "actuarially sound" the rates states must pay insurers in their Medicaid contracts. 987 F.3d at 526. We rejected that challenge, in relevant part, because the private board "function[ed] subordinately to" HHS. *Id.* at 532 (quoting *Adkins*, 310 U.S. at 399). That was so because HHS "reviewed and accepted" the board's accounting standards. *Id.* at 533 (citation omitted). Moreover, HHS "ha[d] the ultimate authority to approve" the states' contracts and the agency "superintended" the contract approval process "in every respect." *Ibid.*

We agree with Appellants that *Rettig* is distinguishable from the delegation here. As they point out, in *Rettig*, HHS "retained the power to unilaterally rescind or modify the rule incorporating the private organization's standards." The power to strip the private organization's power altogether is on par with the SEC's power to abrogate the private organization's rules—a clear hierarchy exists in both cases. By contrast, the FTC has only limited review over the Authority's primary rulemaking power by design and, additionally, lacks the power to change the Authority's proposed rules. § 3053(c). Again, as the district court itself recognized,

----

finds that such proposed rule change is consistent with the requirements of this title and the rules and regulations issued under this title that are applicable to such organization."). This again overlooks the separate provision empowering the SEC to "abrogate, add to, and delete from" FINRA rules "as the [SEC] deems necessary or appropriate to insure the fair administration of the self-regulatory organization . . . ." *Id.* § 78s(c).

No. 22-10387

"[o]nly an act of Congress could permanently amend any Authority rule or divest it of its powers." *Black*, 2022 WL 982464, at *23.

Another distinction lies in the scope of the private entity's power. In *Rettig*, the private board contributed to a small part of the regulatory scheme, merely acting as an aid to HHS. *Cf. Adkins*, 310 U.S. at 388. By contrast, HISA entrusts the entire regulatory scheme to the Authority, fettered only by the FTC's limited review. As the district court correctly put it: whereas "the subdelegated power in *Rettig* concerned only 'a small part of the [contract] approval process,'" "[i]n HISA, by contrast, Congress instructs the Authority to draft myriad medication control and racetrack safety rules." *Black*, 2022 WL 982464, at *18 (quoting *Rettig*, 987 F.3d at 533).

Consequently, *Rettig* does not compel finding that HISA's delegation to the Authority clears the hurdle of the private non-delegation doctrine.

### 4. Amtrak I *shows why HISA is unconstitutional.*

Finally, to support their case against HISA, Appellants rely on the Amtrak litigation, which unspooled for years in the D.C. Circuit and the Supreme Court. *See Amtrak I*, 721 F.3d 666; *Amtrak II*, 575 U.S. 31; *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.* [*Amtrak III*], 821 F.3d 19 (D.C. Cir. 2016); *Amtrak IV*, 896 F.3d 539. Those cases addressed a federal law (section 207 of the Passenger Rail Investment and Improvement Act of 2008) that empowered a putative private entity (Amtrak) and an agency (the Federal Railroad Administration or "FRA") to "jointly develop" railroad performance standards. *Amtrak I*, 721 F.3d at 668. If Amtrak and FRA disagreed, either could have an arbitrator settle the disagreement. *Id.* at 669. In *Amtrak I*, the D.C. Circuit found a private non-delegation problem. *Id.* at 677. In *Amtrak II*, the Supreme Court vacated and remanded because it concluded Amtrak was really a government actor. In *Amtrak III*, the D.C. Circuit found section 207 violated due process by giving regulatory power to

No. 22-10387

the "economically self-interested Amtrak." 821 F.3d at 39. Finally, in *Amtrak IV*, the D.C. Circuit held that striking the arbitration provision cured that constitutional problem by "eliminat[ing] Amtrak's ability and power to exercise regulatory authority over its competitors." 896 F.3d at 548.

We agree with Appellants that the private non-delegation analysis in *Amtrak I* supports their claim that HISA is unconstitutional. The D.C. Circuit found the delegation to Amtrak exceeded what the Supreme Court approved in either *Currin* or *Adkins*. Unlike the private growers in *Currin*, Amtrak helped craft the regulations. 721 F.3d at 671. Unlike the industry actors in *Adkins*, Amtrak could check FRA's regulatory authority. *Ibid.* And, "more damningly," the agency in *Adkins* could "unilaterally change" proposed rules, whereas Amtrak's authority was "equal" to FRA. *Ibid.* Each of those features also condemns HISA. Unlike in *Currin*, the Authority writes the rules. Unlike in *Adkins*, the Authority can effectively veto the FTC's suggested modifications. And, "more damningly," the FTC cannot unilaterally change the Authority's proposed rules. *Ibid.* Indeed, given its limited review, the FTC can merely recommend modifications to rules insofar as they are "inconsistent" with the Act, but the agency cannot second-guess the Authority's policy choices. So, "should the [FTC] prefer an alternative to [the Authority's] proposed [rules], [HISA] leaves it impotent to choose its version without [the Authority's] permission." *Ibid.* These are not the marks of a private entity that "functions subordinately" to and "in aid of" an agency with "pervasive surveillance and authority" over it. *Adkins*, 310 U.S. at 388, 399. *Amtrak I* therefore supports our conclusion that HISA is unconstitutional.

The district court found more persuasive the D.C. Circuit's later decisions in *Amtrak III* and *Amtrak IV*. *Black*, 2022 WL 982464, at *20–21. We disagree. Those decisions sound in public non-delegation and due

No. 22-10387

process and so have little bearing here.[36] And, regardless, the district court misapplied them. Severing the arbitration provision in *Amtrak IV* solved the constitutional problem there because, without it, Amtrak no longer had the "power to make law" without the FRA's agreement. *Amtrak IV*, 896 F.3d at 548 (quoting *Amtrak III*). Not so here. If the Authority's proposed rules pass the FTC's limited consistency review, the FTC has no choice but to approve the rules. *See* § 3053(c)(2). And, as already discussed, HISA gives the FTC no power to exercise its own policy judgment during the review process. *See supra* Part IV.B.1. Thus, the district court erred in finding that the FTC "always has 'the final say,'" over the rules. *Black*, 2022 WL 982464, at *21 (quoting *Boerschig*, 872 F.3d at 708). The agency in *Amtrak IV* may have had the final say over railway standards, but the Authority has the final say over horseracing rules. Instead of *Amtrak IV*, we conclude that *Amtrak I* better illuminates HISA's constitutional flaws.

## V. Conclusion

By delegating unsupervised government power to a private entity, HISA violates the private non-delegation doctrine. We therefore DECLARE that HISA is unconstitutional on that ground.[37]

The district court's decision is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

---

[36] That is because they were both decided after the Supreme Court recognized Amtrak's governmental status in *Amtrak II*, 575 U.S. at 55.

[37] Because we resolve the case on that ground, we do not address the district court's conclusion rejecting the Appellants' due process claims on the ground that the Authority is not a self-interested industry participant. Likewise, we need not examine the Appellants' additional arguments concerning the Authority's investigative and enforcement measures—without the rulemaking authority, the investigative and enforcement powers are nugatory and no party suggests otherwise.